160 So.2d 706 (1964)
J.C. BENEFIELD, Petitioner,
v.
The STATE of Florida, Respondent.
No. 32506.
Supreme Court of Florida.
February 12, 1964.
*707 Fogle, Wilson & Shingler, St. Petersburg, and Lindsey & Cargell, St. Petersburg Beach, for petitioner.
James W. Kynes, Atty. Gen., and James G. Mahorner, Asst. Atty. Gen., for respondent.
TERRELL, Justice.
Petitioner, J.C. Benefield, was informed against for grand larceny. He was tried by a jury and convicted of attempt to commit grand larceny. On appeal his conviction was affirmed by the District Court of Appeal, Second District. Petitioner now seeks review of the latter judgment by certiorari on the theory that it is in direct conflict with this court's decision in Dickens v. State, Fla. 1952, 59 So.2d 775.
It is clear from an examination of the opinions in the case at bar and the Dickens case that although both involve substantially the same controlling facts, identical rules of law were applied to each in such a way as to produce opposite results. That is sufficient to activate this court's jurisdiction. See Nielsen v. City of Sarasota, Fla. 1960, 117 So.2d 731.
If there are those who do not think we have jurisdiction on this theory, certainly we have it on the theory that the decision of the district court of appeal herein has generated confusion and instability among the precedents rendering the law "unclear, if not in conflict," as we said in Trustees of the Internal Improvement Fund v. LoBean, Fla. 1961, 127 So.2d 98. For additional authorities see Justice Thornal's opinion in Kyle v. Kyle, Fla. 1962, 139 So.2d 885, and Justice Hobson's special concurrence in King v. State, Fla. 1962, 143 So.2d 458, and his opinion in Pinkerton-Hays Lumber Co. v. Pope, Fla. 1961, 127 So.2d 441.
The essential facts in the case are as follows: Petitioner is alleged to have approached Hollander and Rosenthal, operators of a bowling alley located in St. Petersburg, and offered to help them secure a liquor license if they would pay him $5,000 in small bills. On April 27, 1961, Hollander and Rosenthal, after notifying the St. Petersburg Times and the St. Petersburg police department and securing certain marked money from their attorney, went to the petitioner's office. The petitioner was not at his office but was at home sick so they proceeded to his home in St. Petersburg. They were accompanied by two city detectives who waited outside while Hollander and Rosenthal entered the petitioner's home for the purpose of delivering the marked money to him. Upon completion of the transaction with petitioner, Hollander and Rosenthal left the house. One of the police officers, Sgt. Hooper, approached Hollander and Rosenthal just as they left the doorway. The sergeant asked Hollander if the petitioner had the money. Hollander nodded yes. The police officer then "stepped inside the door," asked petitioner's wife if the petitioner was home and if he could see him, walked back to the petitioner's bedroom, and after identifying himself to the petitioner, placed the petitioner under arrest. Sgt. Hooper further testified that when he entered the front door it was open, that Hollander was holding it open, and that he stepped inside before he saw petitioner's wife.
Hollander testified that he did not hold the door open for the officers, and petitioner's wife testified that by the time she had reached the hall, Sgt. Hooper had opened the door and was standing inside.
The record discloses that the two arresting officers made no announcement of their authority and purpose before entering petitioner's home; in fact, this was not done *708 until the officers entered petitioner's bedroom at the rear of the home. The trial judge himself noted that the officers were not inside the home with the permission of petitioner or his wife.
On May 11, 1961, petitioner made timely motion to suppress the introduction of the marked money on the ground that it was secured by an unlawful search and seizure. Said motion was denied by the trial court on August 17, 1961, after hearing testimony and arguments of counsel.
It is clear from the record that the police officers did not have a search warrant or a warrant for petitioner's arrest and that the search for the money took place subsequent to petitioner's arrest.
The district court of appeal held that because the police officers had reasonable grounds to believe that petitioner had committed a felony, his arrest without a warrant was authorized by § 901.15, Florida Statutes, F.S.A., and thus valid. Said holding of the district court of appeal might have been a correct interpretation of § 901.15 if the officers had found petitioner out on the commons and were attempting to arrest him. In this case petitioner was in his home and the officers were proceeding under § 901.19(1), Florida Statutes, F.S.A. They were bound by the requirements of that act and what we have said here relates to the execution of it. There was no attempt whatever to comply with § 901.19(1), Florida Statutes, F.S.A., and the two acts relate to a different kind of arrest.
The evidence seized, in order to be admissible at trial, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. Mixon v. State, Fla. 1951, 54 So.2d 190. The lawfulness of an arrest without warrant, in turn must be based upon probable cause, which exists, where the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed. Ker v. California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; Dunnavant v. State, Fla. 1950, 46 So.2d 871. In the instant case the officers were in possession of the affidavits of Hollander and Rosenthal which described the petitioner's activities prior to the payoff. The officers also were aware that Hollander and Rosenthal had entered the petitioner's house for the purpose of delivering certain marked money to him. Immediately prior to their entry into petitioner's home, Hollander had informed the arresting officer that the money had been delivered. It is, therefore, clear that the officers may have had probable cause to believe a felony had been committed. Nevertheless, the question recurs, was the lawfulness of the arrest, even though based on probable cause, vitiated by the unlawful means in which the home was entered?
In a recent opinion of the Supreme Court of the United States, that court recognized that the lawfulness of an arrest by a state officer for an offense against a state is to be determined by state law. Ker v. California, supra.
Section 901.19(1), the applicable Florida Statute, provides:
"An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose."
The facts reveal that the officers did not make the slightest effort to comply with this statute. Although there is some question as to whether or not Hollander held the door open for Sgt. Hooper, Hollander's testimony, as well as that of Mrs. Benefield, clearly discloses that the officer opened the unlocked screened door and stepped into the house. Such an entry would constitute entry by breaking. Boynton *709 v. State, Fla. 1953, 64 So.2d 536, 548, and Scott v. State, Fla.App. 1962, 137 So.2d 625.
It is true that the act is ambiguous and poorly drawn, but a reasonable interpretation of it runs like this: When an officer is authorized to make an arrest in any building, he should first approach the entrance to the building. He should then knock on the door and announce his name and authority, sheriff, deputy sheriff, policeman or other legal authority and what his purpose is in being there. If he is admitted and has a warrant, he may proceed to serve it. He is not authorized to be there to make an arrest unless he has a warrant or is authorized to arrest for a felony without a warrant. If he is refused admission and is armed with a warrant or has authority to arrest for a felony without a warrant, he may then break open a door or window to gain admission to the building and make the arrest. If the building happens to be one's home, these requirements should be strictly observed.
Entering one's home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial. It was condemned by the yearbooks of Edward IV, before the discovery of this country by Columbus. Judge Prettyman for the Court of Appeals in Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456, 465, discussed the history and reasons for it. See also 22 Mich.L.Rev. 541, 673, 798, "Arrest Without a Warrant," by Wilgus. William Pitt categorized a man's home as his castle. Paraphrasing one of his speeches in which he apostrophized the home, it was said in about this fashion: The poorest pioneer in his log cabin may bid defiance to the forces of the crown. It may be located so far in the backwoods that the sun rises this side of it; it may be unsteady; the roof may leak; the wind may blow through it; the cold may penetrate it and his dog may sleep beneath the front steps, but it is his castle that the king may not enter and his men dare not cross the threshold without his permission.
This sentiment has moulded our concept of the home as one's castle as well as the law to protect it. The law forbids the law enforcement officers of the state or the United States to enter before knocking at the door, giving his name and the purpose of his call. There is nothing more terrifying to the occupants than to be suddenly confronted in the privacy of their home by a police officer decorated with guns and the insignia of his office. This is why the law protects its entrance so rigidly. The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country. Liberty without virtue is much like a spirited horse, apt to go berserk on slight provocation if not restrained by a severe bit.
In this case the officers totally ignored every requirement of the law as above interpreted. They barged into petitioner's home without knocking or giving any notice whatever of their presence; they did not have a search warrant or warrant to arrest anyone; they ransacked petitioner's home without the least semblance of any showing of authority. The petitioner was in bed sick at the time and the officers knew it. For all the record shows, there is no material difference in the entrance here from that in the Dickens case. In that case they entered the back door without permission, while in this case they entered the front door without permission. They were trespassers in both cases. They completely ignored every requirement of § 901.19(1), Florida Statutes, F.S.A., so everything they did inside the home was done as trespassers in total disregard of the responsibility the law imposed on them to knock, give notice and the purpose of their mission. We do not attempt to prescribe what would constitute a reasonable search except to say that what was done here was unreasonable under any standard that would be approved by a free country.
*710 The state argues that the Ker case, supra, involved a California statute similar to § 901.19, Florida Statutes, F.S.A., permitted an unannounced entry because of the fact that the evidence [narcotics] could have easily been destroyed.
As we interpret the Ker decision, the majority of the court held that California had engrafted certain judicial exceptions to their statute and that these exceptions did not violate federal constitutional standards of reasonableness. Even if we had authority to do so, we find no reason to engraft judicial exceptions on the statute in this case. If these amount to amendments to the common law rule, they would have to be done by statute in this state.
Section 901.19, Florida Statutes, F.S.A., like its counterpart California statute, appears to represent a codification of the English common law which recognized the fundamental sanctity of one's home yet nevertheless provides that an arresting officer "may break open doors, if the party refused upon demand to open them." 1 Hales Pleas of the Crown (1763) 583; see also Justice Brennan's dissent in Ker v. California, supra. The California judicial exceptions to their statute merely represents the recognition of certain established exceptions to the common law rule. As the California court pointed out in the case of People v. Maddox, 1956, 46 Cal.2d 301, 294 P.2d 6, cert. den. 352 U.S. 858, 77 S.Ct. 81, 1 L.Ed.2d 65:
"It must be borne in mind that the primary purpose of the constitutional guarantees is to prevent unreasonable invasions of the security of the people in their persons, houses, papers, and effects, and when an officer has reasonable cause to enter a dwelling and to make an arrest and as an incident to that arrest is authorized to make a reasonable search, his entry and his search are not unreasonable. [7] Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an officer succeeds in getting to a place where he is entitled to be more quickly than he would, had he complied with section 844. [8] Moreover, since the demand and explanation requirements of section 844 are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose. Read v. Case, 4 Conn. 166, 170 [10 Am.Dec. 110]; see, Restatement, Torts, § 306, comment d. Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance."
As we interpret the common law authorities in relation to § 901.19(1), Florida Statutes, F.S.A., we conclude that even if probable cause exists for the arrest of a person, our statute is violated by an unannounced intrusion in the form of a breaking and entering any building, including a private home, except (1) where the person within already knows of the officer's authority and purpose; (2) where the officers are justified in the belief that the persons within are in imminent peril of bodily harm; (3) if the officer's peril would have been increased had he demanded entrance and stated the purpose, or (4) where those within made aware of the presence of someone outside are then engaged in activities which justify the officers in the belief that an escape or destruction of evidence is being attempted. Time and experience will no doubt suggest other exceptions, but when the facts of this case are measured against the statutory criteria and its exceptions, it is clear that the unannounced entry of the officers in this case violated the statute and vitiated the arrest made pursuant to probable cause without warrant.
*711 In reaching this conclusion, we have not overlooked the state's argument that the marked money could have easily been disposed of by the classic method of flushing it down the drain. This argument must be rejected in the face of the practical difficulties inherent in disposing of $3,000 in small bills by that method. Under the peculiar facts of this case, we are convinced that § 901.19(1), Florida Statutes, F.S.A., was violated and that its violation is not excused by any of the exceptions discussed herein and for this reason the fruits of the search being the product of an unlawful arrest and a search incident thereto, should have been excluded by the trial court upon proper motion. Such disposition of this case brings it into harmony with our decision of Dickens v. State, supra, wherein we held:
"When an arresting officer enters one's back door for the purpose of searching the premises and to make an arrest without a search warrant he is little more than a trespasser."
Miller v. United States, 1958, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332, is very similar to the case at bar. Miller was convicted in the District Court, District of Columbia for violating federal narcotic laws. He sought to suppress evidence consisting of marked currency found in his apartment after his arrest. His contention was that the currency was unlawfully seized, since its seizure followed the breaking of his door by police officers who sought to arrest him without a warrant and the officers, before breaking the door, had not informed him of their purpose in demanding admission. The conviction was affirmed by the United States Court of Appeals for the District of Columbia, 100 U.S.App.D.C. 302, 244 F.2d 750. On certiorari the United States Supreme Court reversed the conviction. Justice Brennan, speaking for six justices, held that the arrest was unlawful and the currency seized thereafter inadmissible in evidence since the police officers had not expressly demanded admission or stated the purpose of their presence before breaking defendant's door, and the evidence did not warrant a finding that the facts known to the officers justified them in being virtually certain that defendant knew their purpose so that an announcement thereof would have been a useless gesture.
For the reasons above stated, the decision of the district court of appeal herein is quashed and this cause is remanded to said court for further consideration not inconsistent with the decision herein.
PER CURIAM.
The foregoing opinion and judgment by TERRELL, J., prepared prior to his death on January 12, 1964, is hereby adopted as the opinion and judgment of this Court.
It is so ordered.
DREW, C.J., and ROBERTS, THORNAL, CALDWELL, and HOBSON (Ret.), JJ., concur.
THOMAS atnd O'CONNELL, JJ., dissent.