211 So.2d 79 (1968)
William URQUHART, Appellant,
v.
STATE of Florida, Appellee.
No. 67-216.
District Court of Appeal of Florida. Second District.
May 29, 1968.
Rehearing Denied June 20, 1968.
*80 Henry Gonzalez, Tampa, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and Robert R. Crittenden, Asst. Atty. Gen., Lakeland, for appellee.
LILES, Chief Judge.
The defendant seeks reversal of a judgment and sentence entered pursuant to a jury verdict finding defendant guilty of buying, receiving or aiding in the concealment of stolen property in violation of Florida Statute § 811.16, F.S.A.
On appeal the defendant raises several points, one of which challenges a jury instruction given by the trial judge. The instruction complained of is as follows:
"If you find from the evidence, beyond a reasonable doubt, that the articles listed in the Information, or any of them, were stolen from Mr. and Mrs. Kent McKinley and the said articles, or some of them, were found in the possession of the defendant, the unexplained possession thereof by the defendant may be regarded by you as some evidence that the defendant knew they were stolen. In such case, the guilty knowledge, if any, of the accused does not follow as a presumption of law from the unexplained possession of the property recently stolen. That is to say, there is no conclusive presumption and you are not required to find that the person accused did have such knowledge. The presumption is one that the Jury may infer as a matter of fact, of which you are the sole judges, and which is to be considered by you in connection with all the other circumstances in the case. The circumstance of one being found in possession of recently stolen property is one which may be considered as showing a tendency toward guilt." (Emphasis ours.)
It appears from the record that the police upon confronting the defendant immediately placed him under arrest. In Young v. State, Fla.App. 1967, 203 So.2d 650, 652, *81 the Fourth District Court of Appeal when presented with a similar instruction said:
"The instruction given to the jury had the effect to demand of the defendant an affirmative explanation for the reason the stolen goods were in his possession. At the same time defendant being in police custodial interrogation within the meaning of Miranda would have had the privilege to remain silent. The privilege to remain silent would be a hollow privilege if that silence would create an inference of guilt at the trial. The fact that the defendant remained silent was used against him at trial in the form of the aforementioned jury instruction in violation of the defendant's Fifth Amendment privilege under the Miranda decision."
We followed Young in Gamble v. State, Second District Court of Appeal, 210 So.2d 238, Opinion filed May 8, 1968, stating:
"The rule in this regard is that if the prisoner is alone and indicates in any manner that he does not wish to be questioned the police may not interrogate him. When the prisoner herein refused to talk any more and remained silent, he had claimed the `privilege' within the meaning of Miranda and his failure to completely explain possession of the stolen T-V set could not thereafter create an inference of guilt at his trial."[1]
Under the authority of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Gamble v. State, supra, and Young v. State, supra, we hold that the trial court committed reversible error by giving the instruction in question.[2] It should be noted, however, that the trial court did not have the benefit of Gamble and Young as they were filed subsequent to the trial of this cause.
On appeal defendant also complains of the admission into evidence of seven exhibits. These exhibits were admitted into evidence despite defendant's objections and despite his motion to suppress which was denied without opinion. Since the defendant may be tried again, we feel obligated to pass upon his contentions concerning the admissibility of these exhibits.
Although there is much conflict in the record the essential facts surrounding the seizure of the exhibits in question appear to be as follows:
Peace officers of several agencies had been checking on the activities of defendant and had been keeping under surveillance the home of one Mrs. Yolanda Salgado, from whom defendant rented a room.
On the afternoon of March 11, 1966, an arrest warrant for an alleged breaking and entering in Pinellas County was delivered to an officer at the Tampa Police Department. At approximately 8:30 that evening this same officer observed the defendant driving an automobile about two blocks from the home of Mrs. Salgado. The officer, who was also in a car, followed the defendant to the home of Mrs. Salgado, however, the officer made no attempt to arrest defendant at this time even though he had the arrest warrant in his possession. The officer then summoned other peace officers from the Pinellas County Sheriff's Department, the Tampa Police Department, and the Hillsborough County Sheriff's Department. *82 In all a total of eleven officers assembled across the street from the home of Mrs. Salgado.[3] Five or six of the officers went to the front door of the Salgado home and the remainder went to the back door. When asked what then ensued, Inspector Salla[4] of the Hillsborough County Sheriff's Department testified as follows on direct examination:
"Q Now, were you the officer that knocked on the door before anybody entered the house?
A Yes, sir, I was.
Q Who came to the door?
A I knocked at the door and a young lady came to the door, was later identified as being Mrs. Butts, and I told her who I was and I wanted to see Bill Urquhart. She turned around and at that time told Bill Urquhart, `Someone here at the door wants to see you.' As she did, I pushed it completely open and walked in. At that time, I told Bill that we had a warrant for his arrest and I walked into the living room and I was followed there by several other officers. I believe one of them was Don Anderson, Lt. Frazier and there was two or three other officers behind me."
On cross-examination the following colloquy took place:
"Q Did anyone give you permission to go into that house?
A Well, we had a warrant for his arrest. That gave us permission to go in there and arrest him. Based on that, the warrant indicates anywheres where he was found. He was found in this house. As she, as Mrs. Butts partially opened the door, I looked over to the left of the living room and I could see him sitting there at the end of the settee there. So, I walked in and at that time instructed him that we had a warrant for his arrest.
Q Inspector Salla, are you telling us that you actually could see a man sitting inside and you are outside, to the side? Did you poke your head inside the house?
A I looked in through the door. I just did like this. The door was partially open and he was sitting there and she, when I asked her about Bill Urquhart, she said, she turned around, said, `Well, Bill, there is someone here wants to see you.'
Q And you went right in?
A I pushed the door in and looked over there and there he was.
Q Then, you instructed Mr. Frazier, Lt. Frazier, to serve this warrant on him, is that correct?
A Yes, sir."
Immediately after entering the house one of the officers with Inspector Salla went to the back of the house and unlocked the back door thereby allowing the remaining officers to enter. So, in a matter of moments, a total of eleven law officers were inside the home. Some of the officers were in uniform, at least one was carrying a shotgun. One officer testified that he was holding his firearm in his hand when he entered the home. The defendant was *83 then removed to a bedroom of the home and the arrest warrant was read to him. Shortly thereafter the defendant left in the presence of several officers, including Inspector Salla, and was taken to the Hillsborough County jail. At the jail while defendant was being booked an envelope was found on his person. This envelope contained three rings which were later identified as stolen and which served as the basis for the State's complaint. These rings were labeled as State's Exhibit No. 1. Exhibits Nos. 2-7 consisted of personal property taken from the home of Mrs. Salgado following defendant's arrest. All these exhibits were admitted into evidence over defendant's objection that they were unlawfully seized.
Florida Statute § 901.19(1), F.S.A., provides:
"An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose."
Inspector Salla's actions in pushing open the door constituted a breaking within the meaning of Section 901.19(1). Cf. Benefield v. State, Fla. 1964, 160 So.2d 706; Boynton v. State, Fla. 1953, 64 So.2d 536; Dickens v. State, Fla. 1952, 59 So.2d 775. From his above-quoted testimony it is clear that Inspector Salla did not announce his purpose and he did not wait until he was refused admittance before pushing open the door. Therefore, Inspector Salla failed to comply with the provisions of 901.19(1). Such failure, unless justified, makes the subsequent arrest and incidental search invalid and any evidence seized as a result thereof is inadmissible. Benefield v. State, supra. In Benefield the Florida Supreme Court listed four justifications[5] for not complying with 901.19(1), stating at 160 So.2d page 710:
"As we interpret the common law authorities in relation to § 901.19(1), Florida Statutes, F.S.A., we conclude that even if probable cause exists for the arrest of a person, our statute is violated by an unannounced intrusion in the form of a breaking and entering any building, including a private home, except (1) where the person within already knows of the officer's authority and purpose; (2) where the officers are justified in the belief that the persons within are in imminent peril of bodily harm; (3) if the officer's peril would have been increased had he demanded entrance and stated the purpose, or (4) where those within made aware of the presence of someone outside are then engaged in activities which justify the officers in the belief that an escape or destruction of evidence is being attempted. * *"
The inspector offered no testimony which would place him under one of the four exceptions and thereby justify his non-compliance with the statute. Thus, due to the violation of § 901.19(1), committed by the officer while in the process of arresting defendant, the exhibits were illegally seized and the court committed reversible error by admitting them into evidence.[6]
In addition to violating § 901.19(1) and thereby causing the resulting search and seizure of Exhibits 1-7 to be invalid, the seizure of Exhibits 2-7 would be invalid under the authority of O'Neil v. State, Fla. App. 1967, 194 So.2d 40, and Prather v. State, Fla.App. 1966, 182 So.2d 273. Exhibits 2-7 consist of personal property removed *84 from the house of Mrs. Salgado as a result of the arrest.
In Prather we said at page 275:
"The search was unreasonable and the court erred in denying the motion to suppress. Law enforcement officers may not make a valid search by entering premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for evidence of crime. Such search is unreasonable even though the arrest is supported by probable cause or a valid arrest warrant. Jones v. United States, 1958, 357 U.S. 493, 78 S.Ct. 1253, 3 L.Ed.2d 1514; and Chapman v. State, Fla.App. 1963, 158 So.2d 578."
The actions of the officers in not arresting defendant when he was first sighted, in assembling eleven men and in illegally invading the Salgado home instead of allowing defendant to come to the door, demonstrate that the arrest was conducted in such a manner as to enable the officers to conduct a general exploratory search.[7] Therefore, the products of that search are inadmissible.
Despite the illegality of the arrest and search the State contends that Exhibits 2-7 should be admitted into evidence. First the State argues that Mrs. Salgado consented to the search of the home. Secondly, the State claims that the defendant had no possessory interest in the premises searched, and therefore under the Fourth Amendment of the United States Constitution and Section 22 of the Declaration of Rights of the Florida Constitution the defendant has no standing to challenge the legality of the search and seizure.
While the search warrant was being read to the defendant in a bedroom of her home, Mrs. Salgado allegedly gave her consent to a search of the premises. Mrs. Salgado testified at a hearing on defendant's motion to suppress that she gave no consent, that she asked the officers if they had a search warrant and they replied that they did not need one. However, a peace officer testified:
"I said I hadn't seen her for quite some time and she asked me how I was and I told her I was fine. And I explained the situation why we were in her house at this time. And, at this time, I asked her if it would be all right if we went ahead and looked in the house and she stated that she didn't have anything to hide, that this was her house and hers alone and that everything in the house belonged to her and that we were free to look into this house at our leisure."
His testimony was substantiated by that of two other officers and the trial judge may have found that Mrs. Salgado did in fact tell the officers that they were free to look.
The question presented is, under the circumstances, did Mrs. Salgado's statement constitute a voluntary consent to a search of her home. One way to test the voluntariness of her consent is to examine the occurrence in question from her viewpoint. The occurrence must have appeared to her as follows: At approximately 9:30 at night Mrs. Salgado was seated in the living room of her home with several other persons. There was a knock on the door. One of Mrs. Salgado's guests, a young woman, partially opened the door and the person outside requested to see Bill Urquhart. The young woman turned and told Mr. Urquhart that "someone here at the door wants to see you." As she was making that statement the door was pushed completely open and five or six men walked in. One of the men had a pistol in his hand and another carried a shotgun. One of the men then told Mr. Urquhart that they had a warrant for his arrest. Another man went to the back door and opened it, letting in other officers. *85 In a matter of moments eleven officers were inside the house. Mr. Urquhart was taken to a bedroom in the house by three of the officers. Mrs. Salgado was then asked if it would be all right if the officers "looked in the house." From the record it is clear that Mrs. Salgado did not know that the officers were violating the law in their invasion of her home nor did she know that the arrest of the defendant was illegal. Under facts such as these, we feel it would be unrealistic in the extreme to hold that Mrs. Salgado's statement amounted to a voluntary consent and to find that she was not coerced by the activities of the law officers. See Talavera v. State, Fla.App. 1966, 186 So.2d 811; cf. Dunnavant v. State, Fla. 1950, 46 So.2d 871.
As mentioned above, the State asserts that defendant has insufficient possessory interest in the premises searched to contest the admission into evidence of Exhibits 2-7 which were taken from the bedroom of Mrs. Salgado.[8]
The unrefuted testimony of Mrs. Salgado was to the effect that defendant rented a room in her home. It also appears that defendant's occupancy was not limited to that one room but that he had free access to the remainder of the home.[9] We believe this qualifies defendant as a "lawful occupant" under the authority of State v. Leveson, Fla. 1963, 151 So.2d 283, and under the rationale of that case provides him with sufficient possessory interest[10] to complain of the admission into evidence of the illegally seized property.
The judgment is reversed.
PIERCE and HOBSON, JJ., concur.
NOTES
[1] It is established that an accused does not lose his privilege against self incrimination by failing to affirmatively assert that privilege. The United States Supreme Court said in Miranda v. State of Arizona, 384 U.S. 436, 468, 86 S.Ct. 1602, 1625 n. 37 (1966):

"* * * In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. [Citations omitted.]"
See also Jones v. State, Fla.App. 1967, 200 So.2d 574.
[2] For contrary holding see Shaw v. State, First District Court of Appeal, 209 So.2d 477, Opinion filed April 18, 1968.
[3] When asked why such a large number of officers was necessary to arrest one man, Inspector Salla testified that 16 or 17 years earlier the defendant had shot at an officer when the officer attempted to arrest him. However, no officer testified that he anticipated violence on the part of defendant arising from the arrest in question.
[4] Although, as mentioned above, there was much conflict among the testimony of the peace officers as to what took place at the Salgado home, it appears from the record that Inspector Salla was the first officer at the front door and the first one inside the home.
[5] These exceptions are not exclusive, however, the inspector offered no other justification for his non-compliance.
[6] It should be pointed out that after the validity of an arrest is challenged the burden is upon the State to show that the requirements of a valid arrest have been met. Urso v. State, Fla.App. 1961, 134 So.2d 810.
[7] It should be noted that while the arrest was made at approximately 9:30 p.m., at 2:00 a.m. the following morning officers were still searching the home.
[8] Mrs. Salgado testified at the hearing on defendant's motion to suppress that the items were taken from the defendant's room. However, the law officers testified that she told them that it was her room they were searching.
[9] The room from which Exhibits 2-7 were removed, allegedly Mrs. Salgado's bedroom, contained a considerable amount of clothing belonging to defendant.
[10] If defendant is retried, any motion to suppress filed by him would be governed by the new Florida Rules of Criminal Procedure. Since the applicable Florida Rule, 1.190(h), 33 F.S.A., is derived from Rule 41(e) of the Federal Rules of Criminal Procedure, it may well be that there would be no need for defendant to show a possessory interest in the premises searched. The U.S. Supreme Court in interpreting Rule 41(e) in Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), stated "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." See also Annot. 4 L.Ed.2d 1999.