363 So.2d 1146 (1978)
William H. WILSON, Appellant,
v.
STATE of Florida, Appellee.
No. 78-1073.
District Court of Appeal of Florida, Second District.
November 3, 1978.
*1147 Jack O. Johnson, Public Defender and Thomas A. McDonald, Asst. Public Defender, Bartow, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee and Charles Corces, Jr., Asst. Atty. Gen., Tampa, for appellee.
RYDER, Judge.
William Harrison Wilson appeals the denial of his motion to suppress the evidence against him, and his resulting conviction and sentence contending that the warrantless search of his home was improper. We agree and reverse.
On December 13, 1977, Charles Kanehl, an undercover police officer attempting to purchase cocaine, met with one David Noble. Pursuant to Noble's instructions, Kanehl drove to a specific address in Clearwater. This was a duplex apartment house. When they arrived at the address, Kanehl remained in his automobile and watched Noble go to the door of the first apartment of the duplex (appellant's apartment). Noble entered and thereafter exited from the apartment, returned to Kanehl's vehicle and delivered to him a packet of cocaine. Kanehl then paid Noble $75.00 which Noble took back to the same apartment and again returned to Kanehl's car. They then departed. The substance purchased by Kanehl (and that substance later purchased), was turned over to a laboratory whose analysis proved the substance to be cocaine.
On December 15, 1977 around 1:40 p.m., Kanehl, accompanied by a Detective Logan of the Pinellas Sheriff's Office, met Noble again who rode with them to the same Clearwater address. On this occasion, Noble followed the same routine. He exited Kanehl's vehicle, walked to the same apartment, entered and then returned to the car. This time, however, both Kanehl and Detective Logan bought the cocaine from Noble. After they had given Noble their money in exchange for the cocaine, Noble, as before, carried the money into the apartment and returned to the undercover police vehicle. The parties then drove from the area.
It is interesting to note Kanehl's testimony following the account of the second "buy". In response to a question relating to the officer's ability to enter appellant's apartment, Kanehl alluded to the fact that he and Noble had several brief conversations regarding Noble's source and that there was more cocaine to be purchased. There is also a telling statement that, "We couldn't get in that time", obviously indicating a desire on the part of the investigators to gain entrance into appellant's apartment. The reader should note that these conversations occurred sometime prior to Noble's eventual arrest and the search of appellant's apartment and they weaken the credibility of the State's eventual position that the police wanted to enter appellant's apartment only after Noble's arrest to prohibit possible destruction of the contraband therein.
Still later, on December 16, 1977 the scenario is repeated, but with major alterations. Kanehl was again accompanied by Detective Logan. This time, however, Noble was met at another location, and he followed the two officers to appellant's apartment in another vehicle. Once reaching appellant's apartment, the two automobiles were parked and Noble walked over to Kanehl's car. He told Kanehl he would have to check on the quantity his source had and, according to Kanehl, inquired as to whether Kanehl was still interested in purchasing some LSD. Obviously, this was a reference to some earlier conversation preceding the third meeting.
Having been assured by Kanehl that he and Logan had continued interest in the obtaining of LSD, Noble, according to Kanehl's testimony, "went in the same apartment, the same door, and came back out a few minutes later, got in the back of my car as he had done in the past, and he retrieved three packets of cocaine and a pack of 100 LSD tablets which he sold to myself and Detective Logan, and he was getting out *1148 after we had paid him to go back into the apartment, as he had done in the past, and we arrested him."
Unbeknownst to Noble, on this occasion, Kanehl was "wired for sound"  he was equipped with a body microphone which transmitted sound to a remote police receiver. Also, unknown to Noble, were the existence of a number of backup units in the immediate vicinity. These were marked and unmarked police vehicles which carried, at least, a Sergeant Grass of the Pinellas County Sheriff's Office, a Captain Day, a Sergeant Peel and another unnamed officer of the Largo Police Department. Upon hearing of the arrest of Noble, all of these units immediately converged on Kanehl's vehicle and the scene of the arrest.
Obviously, the police had exercised more than a modicum of pre-planning to arrange for the "body mike", and for the presence of the backup units, not to mention coordinating the transaction with another, independent, police organization.
Thereafter, Detective Sergeant Grass went to appellant's apartment, knocked on his door and informed appellant that the police had reason to believe there were drugs on his premises and that they were going to search his apartment at that juncture, despite the fact they, admittedly, did not have a search warrant for such action. Appellant never consented to a search.
The officers then entered the apartment, searched and found LSD, a controlled substance. Grass testified that he entered the apartment because he felt the contraband inside would have been destroyed since Noble did not return to appellant's residence and that the arrest of Noble (and another individual parked outside appellant's apartment) occurred in an area which was observable from appellant's apartment.
After a hearing on appellant's motion to suppress, the trial court ruled that the search was proper since the arrest of Noble could have been and probably was viewed by the occupants of appellant's residence; that it would have been an unreasonable burden on the police to leave the premises and to secure a search warrant.
One must note, however, that this third meeting with Noble at the appellant's apartment began around 10:00 p.m. At least six hours prior to this meeting, however, the police had in their hands a laboratory report confirming the fact that the previously purchased drugs were cocaine. It was Sergeant Grass who testified before the trial judge that after the third drug buy went down, after Noble's arrest, and after all of the backup police units and additional policemen had swooped down upon the scene (a display of police force that would elevate the paranoia of even the most innocent of citizens), the police did not have time to obtain a search warrant for appellant's home as the hour was late and by the time a judge was located, they feared appellant would have destroyed the contraband the police suspected was in his home. This reasoning does not wash. What happened during the six hour period between receiving proof the police had been sold cocaine out of appellant's apartment on two previous occasions and the time of the third "buy"? The police had time to set up the third "buy". They had time to obtain and install a body mike on Kanehl. They had time to arrange for Logan to accompany Kanehl to meet Noble at a different location than as before. They had time to confer, coordinate and arrange with a sister law enforcement agency a number of backup units. But, they say, not enough time to obtain a search warrant from a judge. Our past service as a trial judge is not so remote as to dim the memory of many instances wherein we were presented with search warrants for our perusal at varying times of the day and night. Surely, during that six hour period between proof of the identity of the drugs and the meeting time that the police at their leisure also arranged, the police could have arranged a conference with one of the twenty-five circuit judges of the Sixth Judicial Circuit or one of the ten Pinellas County judges who would have quickly responded and reviewed their request for the issuance of a search warrant.
Beyond memory, but not beyond written record, was birthed the concept that one has *1149 a greater expectation of privacy in one's own home than elsewhere.
During the latter part of the 16th Century and early 17th Century, Sir Edward Coke (1552-1634) was in the service of Queen Elizabeth as Attorney General. For her he zealously prosecuted, among others, Essex, Southampton and Raleigh. However, when he became Lord Chief Justice of England, he experienced a change in philosophy. Through his decisions, he began defining the rights of the citizenry as opposed to the royal prerogatives and the excesses of the state. It appears that Lord Coke may very well have coined the phrase that one's home is his castle when he wrote, "That the house of everyone is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose; ..." Semayne's case, 5 Co.Rep. 91A, Mich. 2., Jac. 1, The English Reports, In the King's Bench, book 6, page 195. This notion also appears in his Institutes published in 1628.
As the law and democracy developed, we find in the 18th Century the statement of William Pitt, first Earl of Chatham, speaking as to searches incident to the enforcement of an excise on cider: "The poorest man in his cottage may bid defiance to all forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may injure it; but the King of England may not enter it!  All his power dare not cross the threshold of that ruined tenement!" Broom's Leg.Max., pg. 432.
Of course, we all know of the concern for the home expressed by the United States Congress in the creation of the Third and Fourth Amendments to the Constitution which were ratified by the people of the United States on December 15, 1791. Our State's Constitution also displays special concern as to the concept of privacy one has in one's home. Article I, Section 12, Florida Constitution, 1968.
Turning to case law in the state of Florida, we find the erudite former Chief Justice of the Florida Supreme Court, Mr. Justice Terrell adopting the philosophy of Lord Chatham in his last opinion written in the case of Benefield v. State, 160 So.2d 706, 709 (Fla. 1964). There, Mr. Justice Terrell condemned the search of a person's home without warrant, although the search and arrest might have been based upon probable cause, due to the failure of the police to follow Section 901.19, Florida Statutes (1963), the right of an officer to break into buildings to effect arrest.
Unfortunately, we are again confronted with a matter wherein the action taken by the police is their own undoing.
As was so ably said last year by Mr. Justice Sundberg in Hornblower v. State, 351 So.2d 716 (Fla. 1977):
"The Fourth Amendment to the United States Constitution is an expression of our founding fathers' uneasiness with the potential omnipotence of a federal government. It reflects the notion that an individual can never enjoy the tranquility which he deserves if the government is free to tamper with his expectations of privacy through arbitrary searches. Consequently, the central theme of the Fourth Amendment is its prohibition against general searches. Practices like random entries into people's homes or random searches of people walking the streets, to acquire information or obtain evidence are repulsive to our concept of a democratic society.. . In essence, the Fourth Amendment forbids those occurrences and evinces the axiom that privacy is not a gratuity which we hold at the whim of our government. Only when there is a special governmental need that can be stated with particularity, will we allow the government to intrude on an individual's privacy.
To implement this principle, the Supreme Court of the United States has mandated that warrantless searches `are per se unreasonable under the Fourth Amendment  subject only to a few specifically established and well-delineated exceptions.' ... These exceptions have been `jealously and carefully drawn', . . and the burden is upon the State to demonstrate *1150 that the procurement of a warrant was not feasible because "the exigencies of the situation made that course imperative.' ..." Hornblower, supra, at 717 (citations omitted).
As in Hornblower, the State here did not obtain a search warrant to search appellant's home. Although they had at least six hours between the time they had proof the purchased drugs were cocaine and the time of the third "buy", the police didn't even attempt to obtain a search warrant which would have been the key to appellant's door.
The record discloses ample probable cause and time within which to obtain the warrant. We return to the lesson taught to us in Hornblower, supra:
"But the probable cause itself is not sufficient to support a warrantless search. As enunciated above, any warrantless search is presumed to be illegal unless there are exigent circumstances in addition to probable cause. The state submits that the scurrying around by the occupant when the police knocked at the door and announced their presence supplied justification for a warrantless search. It speculates that evidence might have been destroyed had the police taken time to obtain a warrant. We reject this rationale. In his testimony, the officer acknowledged that he intended to enter and search the trailer before he ever approached the mobile home. To sustain respondent's argument would be to endorse the precise kind of conduct which the Fourth Amendment seeks to proscribe. Police could approach a dwelling, armed only with their own subjective suspicion that illegal activity was afoot, and wait for some suspicious movement, thereby giving them justification to break down the door and burst into the dwelling. Officers then would be equipped with the power to conduct any warrantless quest for evidence of guilt or of crime. Consequently, the suspicious movement which occurred when the police announced their presence cannot supply the exigent circumstances for the warrantless search... .
Notwithstanding the existence of probable cause, to carry its burden, the state needed to show that there was insufficient time to secure a search warrant. In effect, if time to get a warrant exists, the enforcement agency must use that time to obtain the warrant. Excluding the consent and plain view situations, which remove the need for a warrant, every `exception' to the warrant requirement derives from an emergency situation, where to obtain a search warrant would defer police activity that must be performed punctually to be effective. Thus, in the search-incident exception, the exigent circumstances justifying quick action are destruction of incriminating evidence within the reach of the arrested individual and harm to the arresting officer." Hornblower, supra at 718.
Even conceding, for the sake of argument, that there may have been exigent circumstances due to the fact that the occupants of the apartment may have observed Noble's arrest, the police created their own exigent circumstances. As was made clear in Hornblower, this sort of police activity cannot and will not be condoned. Turning once again to Hornblower, we adopt and publish anew its philosophy as stated at page 719:
"It is obvious that a balance must be maintained between conflicting interests of society that would promote security within one's home and at the same time, maximize the freedom of law enforcement officers to protect the peace of the community. Towards that goal, the Fourth Amendment establishes a procedure for effectuating the rights of individuals  the deliberation of a dispassionate and detached magistrate who initially makes an independent determination as to probable cause before a warrant may issue. Only under special circumstances is it unnecessary to follow this procedure. Were a magistrate not interposed between the policeman and the individual before a person's privacy was threatened, that precious equilibrium between individual privacy and orderly society would *1151 be disrupted. As stated by the United States Supreme Court in Johnson v. United States, [333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436] supra:

`The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.' (citations omitted)"
A court is reluctant to suppress evidence which, if obtained in lawful fashion, would have been of compelling importance to the prosecution for felony. But there is no other course by which a court can insist upon compliance by police officers with the requirements of law with respect to arrests and searches than to suppress evidence illegally obtained. The applicable rule of law is not difficult to understand. It rests, to be sure, upon the exercise of reasonably sound judgment in appraising the necessities of the moment. But, so does almost every other duty of the police. Unless the necessities of the moment require that the officer break down the door, he cannot do so without a warrant; and if in reasonable contemplation there is opportunity to get a warrant, or the arrest could as well been made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street. The law is otherwise.
In the absence of exigent circumstances, and as said before such circumstances did not exist here except those created by the police themselves, the only key the police would have to a person's home would be the search warrant. Here, they had at least six hours to obtain that key but did not. Clearly then, the entrance into appellant's home was unlawful, the presence of the officers in the home was unlawful, and so the search and the arrest of the appellant was also unlawful. It follows then that the evidence thus procured should have been suppressed. Accordingly, the judgment and sentence are vacated and the cause remanded for further proceedings consistent with this opinion.
GRIMES, C.J., and HOBSON, J., concur.