436 So.2d 916 (1983)
STATE of Florida, Appellant,
v.
Joan DROWNE and George Drowne, Jr., Appellees.
No. 82-908.
District Court of Appeal of Florida, Fourth District.
April 13, 1983.
As Modified on Motion for Rehearing August 31, 1983.
Jim Smith, Atty. Gen., Tallahassee, and Sharon Lee Stedman, and Joy B. Shearer, Asst. Attys. Gen., West Palm Beach, for appellant.
Thomas A. Bratten of Bratten & Harris, P.A., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
The state appeals from an order suppressing evidence obtained pursuant to execution of a search warrant at the residence of a law enforcement officer and his wife. We affirm the result and commend the effort and attention given by the trial judge to his order, which reflects his analysis. It is of immense assistance to this court to know the basis for a trial court's decision.
The case boils down to two basic issues: whether the affidavit which led to the search warrant was legally sufficient; and if so, whether there was a violation of the "knock and announce" requirement in its execution. Although we disagree with the trial court's analysis of the first issue, we agree with respect to the second.

I
We quote in large measure from the affidavit[1] because that is the only way to *917 explain to the trial court and the parties our analysis. The measure of an affidavit leading to a search warrant is set forth in former Justice Goldberg's significant opinion in United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965):
These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.
The basis for the issuance of the search warrant has been described by this court in State v. Powers, 388 So.2d 1050, 1051 (Fla. 4th DCA 1980), petition for review dismissed, 397 So.2d 778 (Fla. 1981), as follows:
Search warrants are issued upon probable cause and facts constituting probable cause need not meet the standard of conclusiveness and probability required of circumstantial facts upon which a conviction may be based. State v. Heape, 369 So.2d 386 (Fla. 2d DCA 1979). Thus, interpretation of the facts in a "commonsense and realistic fashion," United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965), may result in an inference of probable cause to believe that criminal objects are located in a particular place to which they have not been tied by direct evidence. United States v. Valenzuela, 596 F.2d 824 (9th Cir.1979), cert. denied 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979).
(Emphasis original.)
We believe that application of the foregoing reduces the essence of the affidavit to three categories:

*918 1. Who the maker of the affidavit was and the circumstances under which he made it.
From the record, we glean the maker to be a very experienced, well-trained law enforcement officer and conclude that he was caught up in preparation for execution of the anticipated search warrant scheduled for the night of July 3, 1981; that some degree of accelerated activity was involved; and that there was little concern for paragraph structure. We have no way of knowing whether there was available to him a legal adviser, trained in such matters, to edit his work product or the time in which to do it.
2. What the informant was told by Joan Drowne and when.
She told him that she presently had marijuana in her residence; that she would have "dope" at her residence over the weekend of July 4, 1981; and that there were two machine guns on the premises. The circuit judge who subsequently issued the search warrant could have reasonably concluded that all of those statements were made on one occasion by Joan Drowne; and that reference to a forthcoming holiday weekend could have reasonably been made in close proximity to it. The disclosure by the informant to the law enforcement officer on July 2, 1981, rather than at the earlier meeting, would support this reasonable conclusion.
3. What the informant observed in the Drowne residence and when.
He saw numerous weapons  undescribed  in the Drowne residence in the three weeks prior to July 2, 1981; and, over the past two years, he had seen both appellees smoking marijuana. The former observation would strengthen the likelihood in the mind of the issuing circuit judge that Joan Drowne's reference to there being machine guns in the residence was made in the few weeks before the affidavit was presented to him.[2] The second observation would corroborate the likelihood of the presence of marijuana.
Without attempting to be quarrelsome, we question the interpretation given to an affidavit by the appellate court in Orr v. State, 382 So.2d 860 (Fla. 1st DCA 1980), upon which appellees rely. Therein it was held that the following affidavit did not sufficiently establish probable cause because it did not indicate when the informant observed the contraband:
Heretofore, within the past ten days a confidential informant, who has proven reliable in the past, said informant having led to the arrest of persons for drug violations, further it is known by your affiant that said confidential informant has knowledge of the appearance, texture and odor of marijuana, advised your affiant that a quantity of marijuana was inside the above described premises and that said marijuana was observed by said confidential informant. Therefore, your affiant has probable cause to believe that marijuana is now being kept in the above described premises. [Emphasis added.]
Id. at 861. Let us assume that in lieu of an affidavit the issuing circuit judge had sworn the affiant, asked him the following question and received the following answer:
Q. In the last ten days, what, if anything, did the informant advise you?
A. He advised me there was marijuana in the home.
In such dialogue, it seems reasonable to us that the questioning judge could have concluded that there was marijuana in the home at or about the time the informant relayed his information. We so conclude because people interchange "was" and "is" when they speak.[3] Were we to be more esoteric, we would refer to the third division *919 of "meaning"; namely, "pragmatics,"[4] which is described in R. Dickerson, Legal Drafting 34 (1981), as follows:
Pragmatics, which deals with the relation between words and their users or hearers. This considers the psychological consequences of the fact that established meanings constitute verbal habits.

(Emphasis added.)
In contrast to the affidavit in Orr, however, that which the court invalidated in King v. State, 410 So.2d 586, 586 (Fla. 2d DCA 1982), recited, in part:
[Y]our affiant's reason for his belief is that within the last six days he met with a confidential and reliable informant who advised him that inside 118 Lake Avenue, Apt. A, Largo, Pinellas County, Florida, he observed one Diana King rolling handmade cigarettes filled with what he believed to be cannabis (marijuana).
(Emphasis added.) Again, assume the issuing judge had sworn the affiant, asked the following question and received the following answer:
Q. In the last six days, what, if anything, did the informant tell you?
A. That he saw Diana King inside the house rolling cigarettes with what he thought was marijuana.
In the latter hypothetical, unlike the first, "saw" is not practically interchangeable in modern speech with "see" as "was" with "is." Accordingly, we can understand the result in King. Like the first hypothetical, however, the affidavit in the present case is reasonably tied to a time frame, in that it is in close proximity to July 2, 1981.

ON MOTION FOR REHEARING
We withdraw the latter part of the earlier opinion State v. Drowne, 436 So.2d 916 (4th DCA Apr. 13, 1983) that commences with the discussion of II and substitute therefor the following:[1a]

II
As for the second issue, the trial court found:
Pursuant to said Affidavit, a Search Warrant was authorized by a Judge. Thereafter, in the evening hours of July 3, a plain-clothes investigator from the State Attorney's office, together with a SWAT team surrounded the Drowne residence and prepared to execute the Search Warrant. As the investigator and the SWAT team approached the house, an 11 to 13-year-old son of the Drownes opened the front door and yelled at two of the family dogs located in the garage to be quiet. At that time, the investigator for the State Attorney's office and one or more members of the SWAT team began running toward the front door apparently unseen by the boy. The boy started to close the door and in fact had moved it from a position of approximately 90 degrees open to approximately 45 degrees open when one of the officers grabbed the door, opened it further, and the investigator and members of the SWAT team stepped to the door where they were met immediately by Mrs. Drowne, who became hysterical, screaming and yelling at the officers. She was advised that they were in fact police officers and was shown a Search Warrant and told that the Warrant was going to be executed. They entered the house with Mrs. Drowne still inquiring as to how she should be assured that they were in fact police officers. Following the finding of the evidence from the rear portion of the house, Mrs. Drowne was shown identification that the investigator was with the State Attorney's office. Mr. Drowne was not present when the Warrant was executed.
It concluded:
In the instant case, the Drowne's son was closing the door, not having seen the officers *920 when the door was grabbed by the officers and opened with the officers stepping to the door. There was no knock by the officers, no notice of the officers' authority, and no refusal of admittance to the house prior to their grabbing of the door and opening of it.[5] While the officers may in fact have announced their authority and purpose once the door was open, such is insufficient in view of the fact that the breaking had already occurred.[6] Nothing prohibited the officers from waiting until the door was closed by the Drowne's son and then their knocking and announcing their authority and purpose. Further, there was no evidence that the officers had reasonable grounds to believe that the evidence would be destroyed or that their safety would be threatened by knocking and announcing. Earman vs. State, 265 So.2d 695 (Fla. 1972), State v. Collier, 270 So.2d 451 (Fla. 4th DCA 1972).
[5] Section 933.09, Florida Statutes (1981), provides:
The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of his authority and purpose he is refused admittance to said house or access to anything therein.
[6] There is authority to support the trial court's conclusion that the officers' preventing the door from being closed constituted a breaking. Urquhart v. State, 211 So.2d 79 (Fla. 2d DCA 1968). See also Anno. 70 ALR 3d 871 (1976). On the subject of "breaking" generally, see Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) and Cartey v. State, 337 So.2d 835 (Fla. 2d DCA 1976).
The trial court quoted at length from Benefield v. State, 160 So.2d 706 (Fla. 1964):
Entering one's home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial. It was condemned by the yearbooks of Edward IV, before the discovery of this country by Columbus... . William Pitt categorized a man's home as his castle. Paraphrasing one of his speeches in which he apostrophized the home, it was said in about this fashion: The poorest pioneer in his log cabin may bid defiance to the forces of the crown. It may be located so far in the backwoods that the sun rises this side of it; it may be unsteady; the roof may leak; the wind may blow through it; the cold may penetrate it and his dog may sleep beneath the front steps, but it is his castle that the king may not enter and his men dare not cross the threshold without his permission.
Id. at 709.
This sentiment has moulded our concept of the home as one's castle as well as the law to protect it. The law forbids the law enforcement officers of the state or the United States to enter before knocking at the door, giving his name and the purpose of his call. There is nothing more terrifying to the occupants than to be suddenly confronted in the privacy of their home by a police officer decorated with guns and the insignia of his office. This is why the law protects its entrance so rigidly. The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country. Liberty without virtue is much like a spirited horse, apt to go berserk on slight provocation if not restrained by a severe bit.
Id. at 709.
We repeat our initial statement that we agree with the trial court's analysis of this second issue. The officers knew of their obligation to knock and announce when they undertook to execute the search warrant. Although they were aware of machine guns in the residence, there is absolutely nothing in the record to indicate that a modern day Dillinger type character was inside ready to use them. As it turned out, the persons in the home were a woman and children. What the trial court was unwilling to do was to allow the swarming officers to be excused from their obligation not to break the close before providing notice of their authority and purpose  in the absence of additional facts which would establish exigent circumstances, or circumstances indicating the requirement of compliance to *921 be an idle gesture.[2a] It would be inappropriate for us to re-interpret the facts as found by the trial court in the absence of any misperception by the trial court of the probative effect of the evidence. Moreover, we share the trial court's apparent revulsion to the officers' forcing the front door of the home to remain open when the young child was attempting to close it. The trial court obviously believed it to be an unnecessary precipitate act.
We find State v. Manning, 396 So.2d 219 (Fla. 4th DCA 1981), petition for review denied, 407 So.2d 1104 (Fla. 1981), to be factually distinguishable. In that case the officers had knocked. In Manning this court discussed the interests to be protected in applying the rule; and concluded the circumstances of that case, after knocking, did not prevent the officers' entry. In this case we have an unnecessary, premature invasion of the home. Society unanimously rejects unnecessary violence and invasion of rights.
In affirming, we judges acknowledge our study of matters on "instant replay"; and that law enforcement officers function without such luxury. To them suddenness is as routine as studied consideration of a legal issue is to us. Undoubtedly, it would be an education for us to ride with such officers to understand how quickly and unexpectedly events occur each day to which they must make intelligent, trained responses. Moreover, we must apply the same test towards their actions in response to these events as we do to their draftsmanship of affidavits. Nevertheless, these same officers must be consciously aware of the law in order to react properly to the sudden incidents they experience. Had they been so aware of their responsibilities under the knock and announce rule  and the reasons for such rule  the approach in this case would perhaps have led to a proper seizure.
November 15, 1982, was the centennial of the birth of the late Justice Felix Frankfurter. In memorializing the occasion, the comments[3a] of Edwin M. Yoder, Jr., seem an appropriate conclusion to our remarks:
Frankfurter's judicial bent is best epitomized in a story. Friends had taken him, late in life, to see Robert Bolt's great play about Sir Thomas More, A Man For All Seasons. In one scene, More's son-in-law, Roper, indignantly declares that he would cut down every law in England to get at the Devil.
"Oh," More responds. "And when the last law was down, and the Devil turned round on you  where would you hide, Roper, the laws all being flat? This country's planted thick with laws... . Man's laws, not God's  and if you cut them down ... then d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake."
As More's lines were spoken, Frankfurter, edging forward in his seat, enthusiastically whispered: "That's it! That's it!"
DELL, J., concurs.
BERANEK, J., concurs specially.
BERANEK, Judge, concurring specially on rehearing.
I limit my concurrence to the result (affirmance) stated in the original opinion.
NOTES
[1] The heart of the affidavit recited:

Your affiant Marvin Forman is a police officer for the Town of Palm Beach and has been so employed for the past 13 years. Your affiant is presently assigned to investigate matters pertaining to internal affairs of the police department. Your affiant has worked in the Detective Division, Internal Affairs Unit, Intelligence and Organized Crime Bureau over the past 11 years, and has received approximately 2,000 hours of training in Law Enforcement subjects including narcotics and drug enforcement. Your affiant has worked in the aforementioned units since about 1970 and has investigated numerous cases involving the investigation of criminal acts and activity.
During the week of June 22, 1981, your affiant contacted a confidential informant whose name was supplied to your affiant by the Palm Beach County State Attorney's Office, Florida. Your affiant personally met with the confidential informant during the week of June 22, 1981. Confidential informant is a good citizen in the community, is not pending criminal charges, has never been arrested and is not a paid informant. The confidential informant wishes to remain anonymous for fear of reprisal. This confidential informant has previously supplied information to Assistant State Attorney Ann Vitunac of the Palm Beach County State Attorney's Office, Florida, which according to Ann Vitunac, has resulted in the seizure of large quantities of marijuana.
The confidential informant, on July 2, 1981, personally told your affiant that Joan Drowne told the confidential informant that she, Joan Drowne, presently had marijuana in her residence at 12855 Sandy Run Lane, Jupiter, Florida, and would have "dope" there at the residence for the 4th of July, 1981 weekend at that residence.
The confidential informant also told your affiant that he has been at the Drowne residence on prior occasions over the past two (2) years and has personally witnessed Joan and George Drowne smoking marijuana. (George Drowne is a police officer for the Town of Palm Beach, Florida and your affiant knows this of his own personal knowledge).
The confidential informant also told your affiant that he has personally seen numerous weapons in the Drowne residence at 12855 Sandy Run Lane, Jupiter, Florida, within the last three (3) weeks. The confidential informant also said Joan Drowne stated that there were two (2) machine guns on the premises. It is illegal to possess machine guns under Federal Law and Florida Law.
[2] Mere possession of a machine gun in Florida is a felony. See section 790.221, Florida Statutes (1981). That fact satisfied the probable cause requirement without the necessity of disproving defenses in the affidavit. See State v. Thompson, 390 So.2d 715 (Fla. 1980).
[3] For example: "He said there was going to be trouble!"; or "He said the place was on fire"; or "He said there was a problem."
[4] The author's other divisions are "semantics" and "syntactics."
[1a] We do so to provide a clearer explanation of the facts and to acknowledge the withdrawal by the Third District Court of Appeal of its opinion in Riley v. State, 7 Fla.L.W. 2406 (3d DCA Nov. 16, 1982) (published in advance sheet at 421 So.2d 792 but withdrawn), reversed, 8 Fla.L.W. 928, ___ So.2d ___ (3d DCA Mar. 29, 1983) (adopting dissenting opinion of Hendry, J., as opinion of court).
[2a] See United States v. McClard, 333 F. Supp. 158 (D.C.Ark. 1971), affirmed, 462 F.2d 488 (1972), cert. denied, 409 U.S. 988, 93 S.Ct. 345, 34 L.Ed.2d 255 (1972).
[3a] Miami Herald, November 20, 1982, at 31A, col. 6.