630 So.2d 1048 (1994)
STATE of Florida, Petitioner,
v.
Earl R. BAMBER, Respondent.
No. 79263.
Supreme Court of Florida.
January 20, 1994.
Robert A. Butterworth, Atty. Gen., and Brenda S. Taylor and Peggy A. Quince, Asst. Attys. Gen., Tampa, for petitioner.
*1049 Douglas L. Grose, Tampa, for respondent.
SHAW, Justice.
We have for review State v. Bamber, 592 So.2d 1129 (Fla. 2d DCA 1991), based on conflict with cases from Florida's Third and Fifth District Courts of Appeal.[1] We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We approve Bamber.

I. FACTS
Detective Kennedy applied for a no-knock warrant on August 18, 1989, to search the residence of Earl R. Bamber. The proposed search was premised on the following facts as alleged in Kennedy's affidavit:
 Twice during the preceding two weeks a confidential informant had bought cocaine from Bamber in his home.
 According to the informant, Bamber retrieved the drugs from an area near the bathroom.
 Detective Kennedy believes that Bamber has the ability to dispose of the drugs through bathroom facilities.
 Detective Kennedy believes the operation would be "greatly enhanced" if the warrant were executed in no-knock fashion.[2]
The magistrate issued a standard search warrant and attached the affidavit. Detective Kennedy instructed the Hillsborough County Sheriff's SWAT team to secure the residence.
At approximately 4:20 p.m., the SWAT team, dressed in military fatigues and vests emblazoned with the word "SHERIFF," detonated a bomb outside Bamber's home, a four-bedroom, four-bath, split-level house in a residential neighborhood. At the time of the raid, Bamber, his wife, and minor child, and two commercial repairmen were inside. Mr. Wilson, one of the repairman, testified that when he heard the "BOOM," he went to the front door:
Q. Did you hear anyone knock on the door?
A. No, sir. I was walking out the door?
Q. Okay. What did they do to you?
A. Well, I opened the door. I had two buckets of water in my hands and they put a gun to my head and threw me back in the house and slammed me on the ground, and they wouldn't let me move my head, or nothing.
Q. Did they have something about them, when they came in the door, that indicated they were Sheriff's Office; they were law enforcement?
A. They didn't really give me no time to look or nothing. They threw me back in the house and my head on the floor.
Tile-setter Randy Rhodes, the second repairman, testified that he was standing on a ladder in the dining area when he heard the "BOOM":
Q. Did you hear anybody say, "Sheriff's Office, police officers, search warrant"?
A. No. My first thing was to get out of that area. I moved directly into the kitchen area.
Q. Okay.
A. By that time that individual had come into that area at gunpoint and was pointing a gun at me.
At that time he did not say nothing, but forcing me to the floor.
Q. Did you know he was a policeman?
A. No, I did not know.
Q. Okay.
A. I was upset for the fact that someone was pointing a gun at me, and I was using some, using some language myself and telling him... .

*1050 ... .
[A.] I moved to the back of the kitchen. That's when I looked outside and I seen another guy in fatigues, and then another one, and it was like we were in Vietnam. I had never seen anything like that before.
Bamber's wife testified that she too did not know that the men entering her home were officers; she believed her home was being invaded by a gang of robbers. And Bamber himself testified that he was in the bedroom watching television when he heard the bomb:
A. It was a real loud explosion. I stood up and opened the door to see what was going on, and there was a man that ran through the door and knocked me down; hit me with a gun [on] my head.
Q. What was this man wearing?
A. Fatigues.
Q. Did he identify himself as "sheriff"?
A. No, sir.
Q. Okay. Did he have on his person something you could see that you saw and recognized to be a law enforcement officer?
A. No, sir.
Q. Did you hear anyone announce, "police, Sheriff's Office, law enforcement," anything that would indicate who this man was coming in your door?
A. No.
... .
A. As soon as he knocked me down, I got up, and they knocked me down again and broke my finger.
Detective Kennedy arrived after the occupants had been subdued and read them the warrant. During the subsequent search, police found a small amount of cocaine in Bamber's pants pocket and a small quantity of marijuana. Bamber was charged with simple possession of cocaine and marijuana. The trial court granted Bamber's motion to suppress the drugs and the district court affirmed, ruling that section 933.09, Florida Statutes (1989), requires officers to knock and announce their presence and purpose before forcibly entering a residence. The State sought review based on conflict with cases approving no-knock raids.[3] The State argues that Detective Kennedy's affidavit reasonably established that Bamber had the immediate ability to destroy drugs through standard bathroom facilities and the magistrate was thus justified in issuing a no-knock search warrant.
The issue before us is twofold: 1) May a magistrate issue a no-knock warrant for the search of a residence? 2) If not, may police nevertheless engage in a no-knock search based on exigent circumstances arising at the scene?

II. NO-KNOCK WARRANTS
No-knock warrants are disfavored under the law and limited largely to those states that have enacted statutory provisions authorizing their issuance. In fact, "[t]he prevailing ... view is that a magistrate may not issue a so-called no-knock search warrant in the absence of such a statutory provision." 2 Wayne R. LaFave, Search and Seizure § 4.8(g) (1987). No statutory authority exists under Florida law for issuing a no-knock search warrant.
The reasoning against no-knock warrants is convincing. Circumstances that may seemingly justify issuance of a no-knock search warrant may change drastically after issuance but before execution of the warrant. Conditions must be assessed at the scene at the time of entry:
While a search warrant must necessarily rest upon previously obtained information... . Facts existing at the time of obtaining a warrant may no longer exist at the time of entry. Such an emergency, therefore, can be judged only in light of circumstances of which the officer is aware at the latter moment.
Parsley v. Superior Court, 9 Cal.3d 934, 109 Cal. Rptr. 563, 566, 513 P.2d 611, 614 (1973). As a matter of policy, no-knock warrants are disfavored because of their staggering potential for violence to both occupants and police, as Congress recently discovered[4] and as is *1051 apparent in the present case. We conclude that in the absence of express statutory authorization no-knock search warrants are without legal effect in Florida.
We must now determine whether a no-knock search of a residence may be lawful based on exigent circumstances arising at the scene.

III. NO-KNOCK SEARCHES
A strong presumption existed against the validity of no-knock searches at common law. Benefield v. State, 160 So.2d 706 (Fla. 1964). In fact, it is generally recognized that police have been required to knock and announce their authority and purpose before breaking into a home since time immemorial. Id. at 709.

A. THE KNOCK-AND-ANNOUNCE RULE
This Court in Benefield explained the basis for the knock-and-announce requirement that has governed residential searches in our state:
Entering one's home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial. It was condemned by the yearbooks of Edward IV, before the discovery of this country by Columbus. Judge Prettyman for the Court of Appeals in Accarino v. United States, discussed the history and reasons for it. William Pitt categorized a man's home as his castle. Paraphrasing one of his speeches in which he apostrophized the home, it was said in about this fashion: The poorest pioneer in his log cabin may bid defiance to the forces of the crown. It may be located so far in the backwoods that the sun rises this side of it; it may be unsteady; the roof may leak; the wind may blow through it; the cold may penetrate it and his dog may sleep beneath the front steps, but it is his castle that the king may not enter and his men dare not cross the threshold without his permission.
This sentiment has moulded our concept of the home as one's castle as well as the *1052 law to protect it. The law forbids the law enforcement officers of the state or the United States to enter before knocking at the door, giving his name and the purpose of his call. There is nothing more terrifying to the occupants than to be suddenly confronted in the privacy of their home by a police officer decorated with guns and the insignia of his office. This is why the law protects its entrance so rigidly. The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country. Liberty without virtue is much like a spirited horse, apt to go berserk on slight provocation if not restrained by a severe bit.
Benefield v. State, 160 So.2d 706, 709 (Fla. 1964) (citations omitted).
Several practical reasons underlie this rule, as noted by Professor LaFave:
Although it has been argued that the protections flowing from the notice requirement are "somewhat tenuous," this is hardly the case. The constitutional requirement of announcement serves a number of most worthwhile purposes: (i) "decreasing the potential for violence"; (ii) "protection of privacy"; and (iii) "preventing the physical destruction of property." As to the first of these, it has been cogently noted that an "unannounced breaking and entering into a home could quite easily lead an individual to believe that his safety was in peril and cause him to take defensive measures which he otherwise would not have taken had he known that a warrant had been issued to search his home." As to the second, notice minimizes the chance of entry of the wrong premises by mistake and the consequent subjecting of innocent persons to "the shock, fright or embarrassment attendant upon an unannounced police intrusion." And even if there is no mistake as to the place to be searched, it is still desirable that those within "know who is entering, why he is entering, and have a few seconds to prepare for his entry." The third purpose is equally valid, for quite obviously a person should ordinarily "be allowed the opportunity to voluntarily admit the officer into his home" instead of suffering damage to his property.
2 Wayne R. LaFave, Search and Seizure § 4.8(a) (2d ed. 1987) (footnote omitted).
Our legislature has codified this knock-and-announce rule in section 933.09, Florida Statutes (1989), which provides that an officer may forcibly enter a home to execute a search warrant only after announcing his or her authority and purpose and being refused entry:
933.09 Officer may break open door, etc., to execute warrant.  The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of his authority and purpose he is refused admittance to said house or access to anything therein.
§ 933.09, Fla. Stat. (1989). In addition to its common law and statutory basis, the rule also has a constitutional dimension, as explained below.

B. EXIGENT CIRCUMSTANCES
Although a strong presumption exists against the validity of a no-knock search, such searches are lawful when circumstances at the scene constitute an emergency that meets certain narrowly prescribed conditions. The United States Supreme Court addressed this issue in Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). There, the Court narrowly approved a no-knock search where a drug suspect had deliberately evaded police surveillance just prior to the officers' unannounced entry into the suspect's home. Four justices recognized an exigent circumstances exception to the knock-and-announce rule and concluded that the Fourth Amendment was not violated under the particular circumstances of that case:
Here justification for the officers' failure to give notice is uniquely present. In addition to the officers' belief that Ker was in possession of narcotics, which could be quickly and easily destroyed, Ker's furtive conduct in eluding them shortly before the arrest was ground for the belief that he might well have been expecting the police. We therefore hold that in the particular circumstances of this case the officers' *1053 method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment as applied to the States through the Fourteenth Amendment.
Id. at 40-41, 83 S.Ct. at 1633-34 (footnote omitted). A fifth justice, Justice Harlan, agreed that the entry was lawful, but disagreed that the Fourth Amendment was even implicated, opting instead for a fundamental fairness analysis. And the remaining four justices felt that the Fourth Amendment had been violated. The dissenters set forth the definitive formulation of exigent circumstances:
Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except (1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.
Id. at 47, 83 S.Ct. at 1636 (Brennan, J., dissenting).
One year after Ker was decided, this Court ruled that our state knock-and-announce statute was violated where police conducted an unannounced entry to make an arrest in connection with a bribery scheme. Benefield v. State, 160 So.2d 706 (Fla. 1964). We noted that because our statute represents a codification of the common law rule against no-knock searches the statute embraces the three common law exceptions recognized by the dissenters in Ker, as well as a fourth:
As we interpret the common law ... we conclude that even if probable cause exists for the arrest of a person, our statute is violated by an unannounced intrusion in the form of a breaking and entering any building, including a private home, except (1) where the person within already knows of the officer's authority and purpose; (2) where the officers are justified in the belief that the persons within are in imminent peril of bodily harm; (3) if the officer's peril would have been increased had he demanded entrance and stated the purpose, or (4) where those within made aware of the presence of someone outside are then engaged in activities which justify the officers in the belief that an escape or destruction of evidence is being attempted.
Id. at 710. Because the police conduct failed to fit within any of the exceptions, we held the intrusion unlawful.

C. THE PARTICULARITY APPROACH
As noted above, police generally are excused from following the knock-and-announce rule where the destruction of evidence is imminent  a circumstance arising often in drug cases. The State in the present case urges us to expand this exception to embrace the "blanket approach" adopted by the district courts in Armenteros v. State, 554 So.2d 574 (Fla. 3rd DCA 1989), and State v. Bell, 564 So.2d 1235 (Fla. 5th DCA 1990), which excuses forcible entry any time a small quantity of drugs is believed to be present in a residence with standard plumbing  regardless of immediacy of destruction. This approach, however, has been rejected by an increasing number of courts in favor of the position articulated by Chief Justice Traynor in People v. Gastelo, 67 Cal.2d 586, 63 Cal. Rptr. 10, 432 P.2d 706 (1967):
The Attorney General contends that unannounced forcible entry to execute a search warrant is always reasonable in narcotics cases, on the ground that narcotics violators normally are on the alert to destroy the easily disposable evidence quickly at the first sign of an officer's presence.
We do not agree with this contention. Neither this court nor the United States Supreme Court has held that unannounced forcible entries may be authorized by a blanket rule based on the type of crime or evidence involved... .
... .
... [W]e have excused compliance with the statute in accordance with established common law exceptions to the notice and *1054 demand requirements on the basis of the specific facts involved. No such basis exists for nullifying the statute in all narcotics cases, and, by logical extension, in all other cases involving easily disposable evidence. The statute does not contain the seeds of such far-reaching self-destruction.
Under the Fourth Amendment, a specific showing must always be made to justify any kind of police action tending to disturb the security of the people in their homes. Unannounced forcible entry is in itself a serious disturbance of that security and cannot be justified on a blanket basis. Otherwise the constitutional test of reasonableness would turn only on practical expediency, and the amendment's primary safeguard  the requirement of particularity  would be lost. Just as the police must have sufficiently particular reason to enter at all, so must they have some particular reason to enter in the manner chosen.
Id. 63 Cal. Rptr. at 12, 432 P.2d at 708. See also Wayne R. LaFave, Search and Seizure, § 4.8(c) (2d ed. 1987). This "particularity approach," which requires more than mere possession of drugs within a residence, is consistent with both the plurality and dissenters in Ker, wherein the Court ruled that the officers' unannounced entry was justified under "the particular circumstances of this case." Ker, 374 U.S. at 40, 83 S.Ct. at 1634.
Florida's Fourth District Court of Appeal eschewed the particularity approach in favor of the blanket approach in the key case of State v. Clarke, 242 So.2d 791 (Fla. 4th DCA 1970), cert. denied, 246 So.2d 112 (Fla. 1971). There, the district court used a two-step analysis. First, it expanded the four Benefield exceptions noted above to include a fifth, the so-called Clarke exception: The knock-and-announce rule may be dispensed with in situations not just where evidence "is being" destroyed but where officers reasonably believe it "would be" destroyed. Second, the court adopted the blanket approach for assessing the reasonableness of the officers' belief:
Time and experience have shown us that the small amounts of drugs usually involved in drug law violations may be easily flushed down a toilet or other drain, and that this is frequently done... . Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guaranties are violated because an officer succeeds in getting to a place where he is entitled to be more quickly than he would had he complied with the statute.
Where, as here, the evidence sought consists of relatively small amounts of contraband, and where a nearby bathroom or kitchen provides for easy disposal, it is not unreasonable for the officers to conclude that an attempt will be made to dispose of the evidence if they announce their presence to those inside the room and thus frustrate the purpose of the arrest and seizure. Unannounced entry under such circumstances is lawful and does not violate the constitutional rights of any person.
Id. at 795.
The Florida Supreme Court recognized the Clarke exception, but declined to apply the blanket approach, favoring instead a particularity approach requiring a showing of "reasonable grounds" for believing that evidence would be "immediately" destroyed:
An appellate court is not justified in concluding there was such an exception as a matter of law when the record is devoid of any testimony by police officers or other competent evidence showing they had reason to fear at time of entry the destruction of evidence... . Essential to such proof in this case is testimony by the arresting officers or other competent evidence that they had reasonable grounds to believe the marijuana within the house would be immediately destroyed if they announced their presence. Absent such evidence, the fruits of any search conducted pursuant to such arrest must be considered illegally obtained.
Earman v. State, 265 So.2d 695, 697 (1972). See also State v. Kelly, 287 So.2d 13, 17 (Fla. 1973) (Clarke exception endorsed and case remanded so trial court could make particularized finding as to whether there existed "good reason to fear at time of entry the destruction of evidence.").
We reaffirm our conclusion in Earman that police may engage in a no-knock search of a residence where officers have *1055 "reasonable grounds to believe the [contraband] within the house would be immediately destroyed if they announced their presence." Earman, 265 So.2d at 697. We find the particularity approach applied by this Court in Earman and Kelly and adopted by a majority of courts preferable to Clarke's blanket approach for assessing the reasonableness of an officer's belief. Accordingly, we hold that an officer's belief in the immediate destruction of evidence must be based on particular circumstances existing at the time of entry and must be grounded on something more than his or her generalized knowledge as a police officer and the presence of a small quantity of disposable contraband in a home with standard plumbing. In short, forcible entry is lawful only under exceptional circumstances, where no reasonable alternative is available.

IV. CONCLUSION
The search in the present case is invalid under virtually any standard. First, according to the warrant's plain language, it is a standard, not a no-knock, warrant. Even if it were a no-knock warrant, such a warrant is without legal effect in Florida, as explained above.[5] Second, no exigent circumstances appear in the record to excuse police from following section 933.09's dictates: Nothing shows that police had reason to fear at the time of entry that Bamber was likely to destroy evidence,[6] or even that a readily disposable quantity of drugs was involved.[7] And third, the record contains no evidence whatever showing that police considered any reasonable alternatives to the full-scale SWAT team invasion of the home involving two innocent workmen and a child.
In sum, to rule as the State asks and create a blanket exception to the knock-and-announce rule for all drug cases would be tantamount to fashioning a judge-made exception that would swallow the legislature's rule.
Accordingly, we approve Bamber.[8]
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] State v. Delasierra, 614 So.2d 564 (Fla. 3rd DCA 1993); Armenteros v. State, 554 So.2d 574 (Fla. 3rd DCA 1989); State v. Thomas, 604 So.2d 1277 (Fla. 5th DCA 1992), review pending, 613 So.2d 12 (Fla. 1992); State v. Bell, 564 So.2d 1235 (Fla. 5th DCA 1990).
[2] The affidavit alleged that Bamber kept a large dog in the house and the safety of the occupants and officers would be enhanced by no-knock execution of the warrant. The record, however, contains no indication whatsoever that Bamber's dog was dangerous in any way or was anything other than a family pet. Accordingly, we do not address the safety issue.
[3] See supra note 1.
[4] See Charles P. Garcia, The Knock and Announce Rule: A New Approach to the Destruction-of-Evidence Exception, 93 Colum.L.Rev. 685, 703-05 (1993) (footnotes omitted), which contains the following passage:

In 1970, the Nixon administration declared a "War on Drugs." The Justice Department urged Congress to enact a comprehensive anti-drug strategy and suggested that a general "no-knock" provision could constitutionally be added to aid in enforcement. Strict police compliance with the "knock and announce" rule allowed drug dealers to flush evidence down the toilet, often frustrating meticulous police investigations, denying police the tactical element of surprise, and increasing the peril police officers face in executing search warrants in the often violent drug trade. The Ninety-first Congress concluded that announced entries posed a great problem in narcotics cases and passed a controversial "no-knock" warrant provision as part of the Comprehensive Drug Abuse, Prevention, and Control Act of 1970.
The new legislation authorized federal "no-knock" warrants when the issuing magistrate found probable cause to believe that notice might allow suspects to destroy evidence. Congress also enacted a broader provision authorizing "no-knock" warrants for the District of Columbia.
... .
The "no-knock" experience lasted four years and demonstrated the inevitability of many of the dangers foreseen in 1970. During the four-year period when "no-knock" warrants were issued, horror stories were legion. Over one hundred newspaper articles, reproduced in the Congressional Record, described a repeated scenario: terrified citizens, thinking themselves targets of burglary or more frightening acts, discovered that they were instead being searched by law enforcement officers who had entered their homes without notice. In an exhaustive eight-week investigation by The New York Times, consisting of interviews with victims of "no-knock" raids, reporters found that "[i]nnocent Americans around the country have been subject to dozens of mistaken, violent and often illegal police raids by local, state and Federal narcotics agents in search of illicit drugs and their dealers." In Florida, complaints of police harassment during drug searches were so overwhelming that Legal Services of Greater Miami was unable to handle the caseload. In Virginia, a terror-stricken woman, a previous burglary victim, shot and killed a young police officer executing a "no-knock" warrant as he burst into her bedroom in the middle of the night. In California, one father was shot through the head as he sat in a living room cradling his infant son. Both the woman and the man were totally innocent of any wrongdoing.
The federal "no-knock" warrants were so disruptive that Congress repealed them four years later. On July 11, 1974, the Senate voted by a two-to-one margin to repeal the "no-knock" provision of the 1970 Act, once again making "no-knock" searches illegal under the federal "knock-and-announce" rule.
[5] We find the State's "good faith" claim to be without merit in light of section 933.09's clear language and the fact that nothing in the warrant itself authorizes police to dispense with section 933.09's requirements.
[6] Although the affidavit attached to the warrant says that "Bamber has retrieved cocaine from an area near the bathroom," there is nothing in the affidavit to show that the proximity of drugs to the bathroom is anything but happenstance. The residence was a conventional four-bedroom, four-bath home, and virtually any room in the home would have been "near a bathroom."
[7] The warrant and affidavit fail to mention the quantity of drugs involved.
[8] We disapprove Delasierra, Armenteros, Thomas, and Bell. See supra note 1. To the extent it endorses the blanket approach for no-knock searches, we also disapprove Clarke.