967 So.2d 1021 (2007)
STATE of Florida, Appellant,
v.
Tony PRUITT, Appellee.
No. 2D06-4006.
District Court of Appeal of Florida, Second District.
November 2, 2007.
*1022 Bill McCollum, Attorney General, Tallahassee, and Jonathan P. Hurley, Assistant Attorney General, Tampa, for Appellant.
James Marion Moorman, Public Defender, and Timothy J. Ferreri, Assistant Public Defender, Bartow, for Appellee.
PER CURIAM.
The State challenges the trial court's order granting Tony Pruitt's motion to suppress the evidence obtained in a search of his home. We reverse.
During the course of an ongoing investigation of a large-scale heroin trafficking operation conducted by the St. Petersburg Police Department ("Department") in cooperation with the United States Drug Enforcement Agency ("DEA") and the Organized Crime Drug Enforcement Task Force (OCDETF), Tony Pruitt was identified as a key participant in that operation and as a distributor of heroin in the St. Petersburg area. After further investigation involving confidential informants, controlled buys of narcotics, and warrant-authorized wiretaps, the Department had enough information to seek a warrant to search Pruitt's home for further evidence of his drug trafficking business. The warrant was issued, and at 5:15 a.m., on January 6, 2004, the St. Petersburg Tactical Apprehension and Control Team (TACT) executed it. In doing so, TACT waited twelve seconds after knocking and announcing *1023 their purpose before forcibly entering the home. The subsequent search resulted in the seizure of two firearms, marijuana, heroin, electronic scales, currency, and documents.
Pruitt filed a motion to suppress the evidence seized in the search on the basis that the forced entry violated Florida's knock-and-announce statute, section 933.09, Florida Statutes (2003). The trial court agreed, holding that the twelve-second delay between the knock and announce and TACT's entry was insufficient, and granted Pruitt's motion to suppress the evidence.
In its appeal, the State argues that there were exigent circumstances justifying the short delay between announcing and forcing entry, specifically law enforcement's knowledge that Pruitt was a suspect in a murder investigation in which the murder weapon was an AK-47. Alternatively, the State argues that based on the recent United States Supreme Court case, Hudson v. Michigan, ___ U.S. ___, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), suppression of the evidence was error even if the time between knocking and announcing and the actual entry was too short.
Our review of a trial court's ruling on a motion to suppress evidence involves a mixed question of law and fact. We accord a presumption of correctness with regard to the trial court's determination of facts where the trial court's factual findings are supported by competent, substantial evidence. However, we review the trial court's application of the law to those facts de novo. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor v. State, 803 So.2d 598 (Fla.2001).
Section 933.09 states:
The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of the officer's authority and purpose he or she is refused admittance to said house or access to anything therein.
Two requirements are imposed by the statute. First, law enforcement must announce their authority and purpose. Richardson v. State, 787 So.2d 906, 908 (Fla. 2d DCA 2001). Second, before law enforcement may forcibly enter the home, they must have been refused admittance. Id. "Refusal can be express or implied, and lack of response is deemed a refusal." Id. Rarely is the first requirement not met. Thus the question typically then arises in conjunction with the second requirement, i.e., how much time should be allowed before the lack of response may be deemed by law enforcement officers at the scene to be a refusal. There is no bright line answer; the only answer found in our case law is that the occupant must have a "reasonable opportunity" to respond. Id. at 908; Holloway v. State, 718 So.2d 1281, 1282 (Fla. 2d DCA 1998). "Time periods less than five seconds are rarely deemed adequate, and periods in excess of fifteen seconds are often adequate." State v. Cassells, 835 So.2d 397, 399 n. 2 (Fla. 2d DCA 2003); see also Richardson, 787 So.2d at 907 (holding that ten-second wait before forcible entry into cocaine dealer's home at 5:30 a.m. and with no indication of exigent circumstances was not long enough); State v. Robinson, 565 So.2d 730, 732 (Fla. 2d DCA 1990) (holding that wait of only "a few seconds" before entering was too short where there were no exigent circumstances); Kellom v. State, 849 So.2d 391, 394 (Fla. 1st DCA 2003) (holding that delay of approximately five seconds was not enough); cf. United States v. Banks, 540 U.S. 31, 38, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) (holding that delay of fifteen to twenty seconds did not violate the knock-and-announce rule); Braham v. State, 724 So.2d 592, 594 (Fla. 2d DCA 1998) (holding *1024 that five to ten seconds between the knock-and-announce and forced entry in early morning execution of search warrant was reasonable where the officers heard movement within, residence was a small trailer, phone was ringing, and no one responded verbally); Hernandez v. State, 863 So.2d 484 (Fla. 4th DCA 2004) (holding that fifteen seconds was reasonable when footsteps were heard within the residence but no one responded to the door).
In this case, the TACT commander testified that he waited "about" twelve seconds after his initial knock and announce before calling for a breach of the door of the residence and that, based on his training and experience, twelve seconds was a reasonable amount of time for a person inside the home to respond to his knock and announcement of authority. The State also argues that the twelve-second delay was reasonable given the small size of the house and the fact that Pruitt could have easily answered the door in that amount of time. However, the trial court likened the delay in this case to the ten-second delay in Richardson, 787 So.2d 906, concluding that there was insufficient time to respond at an hour when the occupants were most likely asleep and no sounds were heard coming from within the house.
The problem with attempting to analyze whether the time delay was long enough so as to be in compliance with section 933.09 is that there is insufficient case law covering the plethora of factual permutations, such as the fact pattern in this appeal, that might occur in any given case. In Hudson, 126 S.Ct. at 2163, the Court noted that "[w]hen the knock-and-announce rule does apply, it is not easy to determine precisely what officers must do. How many seconds' wait are too few? Our `reasonable wait time' standard is necessarily vague." (Citation omitted.) For the most part, Florida opinions either hold that the time delay is too short and conclude that the police violated the knock-and-announce rule or find that exigent circumstances were present excusing compliance with the rule. Hernandez, 863 So.2d 484, and Braham, 724 So.2d 592, appear to be exceptions, but in both cases the finding that the rule was not violated was nevertheless heavily influenced by the circumstances. In the instant case, the trial court found it "unreasonable to expect a sleeping occupant of even a small home to open the front door within twelve seconds." Giving deference to the trial court's factual finding that twelve seconds was insufficient time to allow Pruitt a reasonable opportunity to respond, we turn to the question of whether the premature entry was nevertheless justified by exigent circumstances.
There are four exceptions to the reasonable time requirement of the knock-and-announce rule: (1) the occupant already knows of the officers' authority and purpose, (2) there is a reasonable belief that persons within are in peril of bodily harm, (3) the officers' peril would increase, and (4) the occupants might attempt to escape or to destroy the evidence. Kellom, 849 So.2d at 395 (citing Benefield v. State, 160 So.2d 706, 710 (Fla.1964)). The pertinent exception in this case is the officer peril exception, based on the information that Pruitt was suspected of using an AK-47 in a murder six months earlier and on his history of criminal violence. The State's claim of exigent circumstances based on officer safety is summed up in its response to Pruitt's motion to suppress:
At 5:15 a.m. on January 6th, 2004, the Tactical Apprehension and Control Team (TACT) executed a high risk search warrant at 1000 13th Street North in St. Petersburg after knocking and announcing and then delaying 12 seconds before entering by breaching the door with a battering ram while *1025 simultaneously detonating a distraction device in the kitchen. This was done pursuant to a lawfully executed search warrant. . . .
The TACT team is St. Petersburg's version of a SWAT team and they are utilized to execute search warrants only "with high-risk situations, barricaded subjects, hostage rescue, things of that nature" according to the testimony of Damian Schmidt.[[1]] According to Schmidt this was a "high risk situation in which information was given fitting the criteria where firearms or the subject involved is known to use violence."
At the time that the TACT team entered, they were aware that the subject known to live in the residence was a violent felon and the suspect in a homicide involving the use of an AK-47 in the past 6 months. The TACT team's body armor was not capable of stopping rounds from an AK-47.
Although the TACT team did not have an exact diagram of the residence, they knew from surveillance that the residence was a small single story house. Based on the time given after the initial knock-and-announce, it was the opinion of the knocking officer that the residence had been given sufficient time to answer the door in this small house. It was his further stated opinion based on the circumstances presented that the TACT team was exposed to danger at the front of the house after 12 seconds, which is why he called for the breach of the front door. Upon entering the residence a woman was located on the couch within 10 feet of the front door where the officers were knocking.
During the suppression hearing, the TACT commander described the situation he was faced with on the scene:
And now as time expanded, when I got up to 10 and I'm counting 11, 12, now the team has been compromised to a degree that they know we are out here, so now the risk definitely increases where we may return fire, or the people inside are either barricading themselves or possibly destroying evidence.[2]
In its order, the trial court did not question the veracity or credibility of the information pertaining to Pruitt's alleged use of an AK-47 in a murder but concluded only that this information was stale as a matter of law. The trial court also noted that "neither the warrant nor the supporting affidavit make mention of firearms being located in the residence or the fact that the defendant has a history of violence." The trial court noted further that Pruitt had not yet been charged with the homicide at the time of the raid, and that although TACT may have been informed that Pruitt had a record of violent crimes, "no specific information regarding the defendant's alleged violent history was brought out at the hearing. . . ." (Emphasis added.) The trial court ultimately concluded (1) that twelve seconds was insufficient time to allow for a response "even in a small home," (2) that the information regarding the suspected murder using the AK-47 was stale, and (3) that the information regarding Pruitt's prior violent crimes was unsupported by the affidavit or warrant. Based on this, the trial court concluded that there were "no particularized facts giving rise to a reasonable belief that the officers would *1026 be in greater peril had they complied with section 933.09."
As the trial court correctly stated in its order, in order to invoke the officer peril exception to the knock-and-announce requirement, the police must have a reasonable basis to believe that they would face greater peril by complying with the requirement, see Holloway, 718 So.2d at 1282, and this belief should be based on particularized facts, State v. Bamber, 630 So.2d 1048, 1054 (Fla.1994). In this case, the TACT commander counted to twelve but, as his testimony indicated, felt that since no response was forthcoming from within, his team was now at greater risk and the occupants might be preparing to resist or to destroy evidence. However, if the commander truly felt that the circumstances required the type of overwhelming surprise which might be necessary when entering a dangerous situation, one might question why he chose to count to twelve in the first place. We can only surmise that he thought that by doing so he would be in compliance with the knock-and-announce rule. This is a dilemma created by the courts. Discussing this dilemma, the Supreme Court in Hudson, 126 S.Ct. at 2163, noted that in Banks, 540 U.S. 31, 124 S.Ct. 521, it had held that:
The proper measure was not how long it would take the resident to reach the door, but how long it would take to dispose of the suspected drugs-but that such a time (15 to 20 seconds in that case) would necessarily be extended when, for instance, the suspected contraband was not easily concealed. [Banks, 540 U.S.] at 40-41, 124 S.Ct. 521. If our ex post evaluation is subject to such calculations, it is unsurprising that, ex ante, police officers about to encounter someone who may try to harm them will be uncertain how long to wait.

(Emphasis added.) In a recent opinion of this court, Judge Villanti noted:
Because Florida does not authorize the issuance of no-knock warrants, Bamber, 630 So.2d 1048, the decision to enter on this basis can be made only after arrival at the scene. . . . The supervisor directing the execution of the warrant must have almost swami-like powers to get it right, and the supervisor's decision is only as good as the information he is provided. . . .
Under current case law, the time frame separating a "good" knock-and-announce case from a "bad" one, as this case demonstrates, can be as little as a few seconds.
Simmons v. State, 913 So.2d 19, 24 (Fla. 2d DCA 2005) (Villanti, J., concurring). One can only imagine the dilemma officers find themselves in when they feel compelled, in view of the imprecise case law employing a case-by-case totality analysis, to count seconds before entering while simultaneously being aware of the occupant's violent propensity. We are not aware of any Florida case that thoroughly discusses whether, in the presence of some exigency, some period of time is nevertheless necessary to wait prior to forcing entry. Therefore, it appears to us that when exigent circumstances are present, the amount of time preceding entry is less imperative. Here, it is difficult to believe that a known hard core drug dealer, suspected of possessing an AK-47 used by him to commit a murder, even if given an extra second or two, would gracefully respond by allowing police entry and access to evidence that could be used to imprison him.
The trial court correctly noted that if law enforcement fails to comply with section 933.09 on the basis of officer peril or any other exception, the information upon which the exception is claimed must have some temporal proximity to the execution of the warrant. See Holloway, 718 *1027 So.2d at 1282; Craft v. State, 638 So.2d 1011, 1014 (Fla. 2d DCA 1994). During the suppression hearing in Holloway, the officers testified that a confidential informant had implied that a firearm was present in the defendant's house and that in 1986, Holloway had been convicted of armed robbery and battery on a law enforcement officer. 718 So.2d at 1282. However, the warrant leading to Holloway's arrest was executed nearly ten years after Holloway's armed robbery and battery convictions. Id. This court concluded that the ten-year-old convictions lacked temporal proximity and that a confidential informant's mere implication that a firearm was present was insufficient to support the officer peril exception. Id. Similarly, in Craft, the information that Craft possessed a weapon was over two years old at the time of the execution of the warrant. 638 So.2d at 1013-14. This court held that this evidence "was too stale to provide a reasonable belief that there would be officer peril two years later." Id. at 1014.
This case is distinguishable from Holloway and Craft. The information regarding the potential presence of the firearm here was not the product of stale information, a vague reference, or generalized knowledge; the knowledge was particularized and recent. Pruitt was under an ongoing active investigation for a murder committed with an AK-47. A six-month investigation prior to a felony arrest is not unusual when one considers that potential witnesses are likely either undercover or reluctant to testify because they are involved in the drug trade or know that their lives may be in danger if they do testify. We conclude that under the facts of this case, the information relating to an active investigation regarding Pruitt's alleged involvement in a murder using an AK-47 six months before the execution of the warrant did not render that information stale.
We further note that the Department had been investigating Pruitt's heroin distribution operation for several months. He had contacts throughout the state, had completed over 150 sales of narcotics within a single month,[3] and had prior convictions for possession and sale of narcotics, robbery, and aggravated battery.
[I]t is common sense for officers to believe that a person reasonably suspected to be in possession of both firearms and substantial quantities of illegal drugs will use his firearms to protect himself and his holdings and, thus, poses a threat to the safety of police officers attempting to seize the drugs. State v. Williams, 168 Wis.2d 970, 485 N.W.2d 42, 47 (1992); U.S. v. Singer, 943 F.2d 758 (7th Cir.1991). As the court in U.S. v. Singer, 943 F.2d at 762-63, succinctly put it:
It is a reasonable belief that a person in possession of both firearms and large quantities of drugs poses a threat to the safety of police officers attempting to seize the drugs. Indeed, the courts have recognized that a suspect's propensity for violence can be inferred from the quantity of drugs involved. See U.S. v. Bonner, 874 F.2d 822, 824-25 (D.C.Cir.1989) ("common sense and bitter experience . . . suggests [that] dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia"); United States v. Kane, 637 F.2d 974, 980 (3d Cir. 1981) (reasonable to deduce that weapons are necessary to protect large quantities of drugs); c.f. United States v. Buchanan, 910 F.2d 1571, 1573 (7th Cir.1990) (recognizing that *1028 guns are tools of the drug trade); United States v. Alvarez, 860 F.2d 801, 829 (7th Cir.1988) (same), cert. denied, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989). With these considerations in mind, we believe the gun reputedly in Singer's possession posed a quantifiable risk to the safety of the officers executing the warrant; therefore, this exigent circumstance permitted the police to enter Singer's home, without first knocking and announcing their presence.
Wilson v. State, 673 So.2d 505, 512 (Fla. 1st DCA 1996).
In its order, the trial court likened the freshness of the information regarding Pruitt's suspected use of an AK-47 in a homicide to the requirement of temporal proximity of information necessary for issuance of a search warrant. This analogy is misplaced because the standards are vastly different. In the case of a search warrant, the affidavit must show that the suspect has committed a crime and that evidence of criminal activity will be found at a particular location. The exigent circumstances exception to the knock-and-announce requirement asks only if the officers on the scene[4] have a reasonable belief, under the totality of the circumstances, that one of the exceptions exists. Bamber, 630 So.2d at 1050 ("Conditions must be assessed at the scene at the time of entry."). Thus the determination of the existence of exigent circumstances is a judgment call made by the operational commander at the scene and has no direct relationship to the level of proof necessary for probable cause issuance of a search warrant.
The trial court's attribution of the fact that neither the affidavit nor the warrant indicated Pruitt's potential for violence or the fact that he was a suspect in a recent murder also misses the mark. The affidavit was prepared to fulfill the probable cause requirement for searching for narcotics and evidence of Pruitt's heroin business operation, specifically business and phone records. See Art. I, § 12; Amend. IV., U.S. Const.
The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Thus it was unnecessary to include in the warrant information regarding Pruitt's violent crimes or the murder investigation because this information had nothing to do with establishing probable cause that Pruitt's home would contain drugs or other evidence relating to his heroin trafficking business. The only possible use an issuing magistrate or judge might have for such information would be if he/she intended to issue a no-knock warrant. As noted, this is not permitted in Florida. See Bamber, 630 So.2d at 1050. The information regarding the murder investigation was only necessary for TACT's planning purposes, i.e., to enable TACT to make on-the-spot decisions as to the best way to execute the warrant at the scene, and was immaterial to the purpose of the warrant. Even if that information could be considered to be material, this court has held:
[W]hen a question is raised as to material omissions from the search warrant *1029 affidavit, the court reviewing the matter should consider the affidavit as though the omitted facts were included and then evaluate the presence of probable cause in light of the added facts. This is true whether the facts were intentionally omitted or omitted in good faith. The rule should be applied if the omitted facts were nevertheless relevant and should have been included.
Sotolongo v. State, 530 So.2d 514, 516 (Fla. 2d DCA 1988).
The trial court also likened the instant case to Richardson, 787 So.2d 906, in which this court held that ten seconds was an insufficient amount of time, in the absence of exigent circumstances, to allow for a response after knocking where the warrant was executed at 5:30 a.m. However, in Richardson, there was no mention of firearms or threat of violence; the court engaged in a straightforward analysis of what should be a reasonable time vis-à-vis section 933.09 under the facts of that case. In contrast, the instant case involved specific information regarding the probability of the presence of firearms and the potential for violence. "In consideration of the violence which surrounds illegal drug trafficking, it is not reasonable to expect law enforcement officers to risk their lives and the lives of others when possessed of information as was present in this case." State v. Avendano, 540 So.2d 920, 920-21 (Fla. 2d DCA 1989).[5]
In the instant case, the officers knew they were not dealing with a minor league crack or marijuana dealer. The affidavit for search warrant described a person who ran a large or growing heroin distribution operation, who used semi-sophisticated techniques to elude law enforcement, such as the use of female "mules" or hiding heroin in the dashboard or body of a vehicle, and who was a participant in a larger heroin distribution network. Additional information provided to TACT supported their reasonable belief that they were dealing with a violent career criminal. See Power v. State, 605 So.2d 856 (Fla.1992) (holding that police officers were not required to knock and announce when executing a search warrant where they had been informed that the defendant used a gun or knife to rape, had committed armed robbery, had a black belt in karate, had a gun, and had a violent background). In Power, there was no indication that the "specific" information that Power had used a gun or knife in the rape was also included in the warrant; it was simply information provided to the police officers prior to their execution of the warrant. See also Poole v. United States, 630 A.2d 1109, 1124 (D.C.App.1993) (holding that where officers entered after ten seconds in the reasonable belief that defendant was on premises and had a gun and would use it if confronted provided exigent circumstances excusing full compliance with the knock-and-announce statute). Significantly, during the hearing, the TACT commander testified that he had not even read the warrant itself. Thus inclusion of information in the warrant regarding Pruitt's potential for violence and the murder investigation would not have assisted his exigency assessment regarding officer peril.
We also note that TACT was concerned about the fact that gunfire from an AK-47 can pierce the body armor worn by its members. This knowledge made the exigency of the situation that much more critical. Finally, we note that the decision *1030 to use TACT in the first place indicates the degree of concern the Department had that Pruitt might respond to the execution of the warrant violently.
Based on the foregoing, we conclude that the trial court erred as a matter of law in concluding that exigent circumstances did not exist justifying TACT's entry into Pruitt's house after waiting twelve seconds. Because the trial court's order must be reversed for the reasons stated herein, we decline to address whether Hudson would have precluded suppression of the evidence in this case regardless of any knock-and-announce violation.
Accordingly, we reverse the trial court's order granting Pruitt's motion to suppress the evidence and remand for further proceedings consistent with this opinion.
Reversed and remanded.
DAVIS, J., and THREADGILL, EDWARD F., Senior Judge, Concur.
VILLANTI, J., Concurs specially.
VILLANTI, Judge, Specially concurring.
Although the majority stops short of reaching the Hudson issue, on the outside chance that further review or reversal of the majority holding were to occur, I would have addressed the Hudson issue as one of first impression in Florida. In addition, in my view the Hudson issue is the stronger reason supporting reversal of the trial court's suppression order in this case. In all other respects, I completely concur in the majority opinion. Here, then, is that discussion of the Hudson issue.
In its order granting Pruitt's motion to suppress, the trial court pointed out that in Hudson, the Supreme Court's analysis of the knock-and-announce rule was based on the Fourth Amendment, whereas the issue in this case is the purported violation of a state statute, section 933.09. The trial court concluded that because "greater protections [than those based on constitutional protections] may be afforded to citizens via state statute," section 933.09 provides a greater degree of protection than the Fourth Amendment or article I, section 12, of the Florida Constitution, and Hudson did not apply. I disagree.
I submit that whether the knock-and-announce rule is regarded as a creature of statute, the Fourth Amendment, or the common law, it is subject to the same analysis. This is so because any applicable statute and the incorporation of the rule into the Fourth Amendment historically arose from the same common law origins. See Sabbath v. United States, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) (holding that the exceptions to the common law knock-and-announce rule also applied to 18 U.S.C. § 3109 "since they existed at common law, of which the statute is a codification"). In Hudson, the Supreme Court discussed the common law roots of the rule:
The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one. See Wilson v. Arkansas, 514 U.S. 927, 931-932, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). Since 1917, when Congress passed the Espionage Act, this traditional protection has been part of federal statutory law . . . and is currently codified at 18 U.S.C. § 3109. We applied that statute in Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), and again in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). Finally, in Wilson, we were asked whether the rule was also a command of the Fourth Amendment. Tracing its origins in our English legal heritage, 514 U.S. at 931-936, 115 S.Ct. 1914, we concluded that it was.
*1031 Hudson, 126 S.Ct. at 2162. In United States v. Ramirez, 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998), the Supreme Court stated:
We remove whatever doubt may remain on the subject and hold that § 3109 codifies the exceptions to the common-law announcement requirement. If § 3109 codifies the common law in this area, and the common law in turn informs the Fourth Amendment, our decisions in Wilson and Richards serve as guideposts in construing the statute. In Wilson v. Arkansas, 514 U.S. 927[, 934], 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), we concluded that the common-law principle of announcement is "an element of the reasonableness inquiry under the Fourth Amendment". . . . [I]n Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), we articulated the test used to determine whether exigent circumstances justify a particular no-knock entry.
See also United States v. Banks, 540 U.S. 31, 42, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) (holding that the result should be the same under the Fourth Amendment and § 3109). The knock-and-announce rule, as incorporated into federal statute in 18 U.S.C. § 3109, states:
The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.
The Florida version (section 933.09), originally codified in 1923,[6] is an almost verbatim copy of the federal version:
The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of the officer's authority and purpose he or she is refused admittance to said house or access to anything therein.
Recognition of the knock-and-announce rule as a statutory restatement of common law occurred as early as 1958. In Miller v. United States, 357 U.S. 301, 308-09, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), the Court stated:
The requirement was pronounced in 1603 in Semayne's Case, 5 Coke Co.Rep. 91a, 11 E.R.C. 629, 77 Eng.Repr. 194, at 195: "In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K(ing)'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors * * *."
The requirement stated in Semayne's Case still obtains. It is reflected in 18 U.S.C.s 3109, 18 U.S.C.A.s 3109, in the statutes of a large number of States, and in the American Law Institute's proposed Code of Criminal Procedure, s 28.
(Emphasis added; footnotes omitted.) However, it was not until 1995 that the Supreme Court announced that the rule was also inherent in the Fourth Amendment. See Wilson v. Arkansas, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) (holding that the common law knock-and-announce principle forms a part of the Fourth Amendment reasonableness inquiry); see also Hernandez v. State, 863 So.2d 484, 486 (Fla. 4th DCA 2004) (noting that the Supreme Court in Banks had held that a fifteen-to twenty-second wait before forcible entry "satisfied both the Fourth *1032 Amendment and 18 U.S.C. 3109, which is almost identical to section 933.09").
After Hudson, the United States District Court for the District of Columbia held that, pursuant to Hudson, the exclusionary rule did not apply to entitle defendant to suppression of evidence seized during the search under the District of Columbia knock-and-announce statute, section 23-524(a). United States v. Southerland, 466 F.3d 1083, 1084 (D.C.Cir.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1361, 167 L.Ed.2d 137 (2007). Noting that the District of Columbia statute fully incorporated § 3109 (as does the Florida statute), the Court stated:
Before Hudson the Supreme Court began treating § 3109 and the knock-and-announce rule of the Fourth Amendment as identical, see Ramirez, 523 U.S. at 73, 118 S.Ct. 992, which is why "the result should be the same under the Fourth Amendment and § 3109," United States v. Banks, 540 U.S. 31, 42, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003).
Id. at 1085. Other courts have also applied Hudson to violations of knock-and-announce statutes with similar results. See United States v. Bruno, 487 F.3d 304, 306 (5th Cir.2007) (holding that even if law enforcement violated the knock-and-announce statute, suppression is not available as a remedy after Hudson); United States v. Ramirez, 196 Fed.Appx. 538, 539 (9th Cir.2006) (noting that "[s]uppression of the evidence is not an available remedy for violations of the `knock and announce' rule under 18 U.S.C. § 3109"); State v. Oliver, 112 Ohio St.3d 447, 860 N.E.2d 1002, 1004 (2007) (noting that Hudson is applicable to State's knock-and-announce statute); State v. Marcum, 2006 WL 3849861, slip op. at *7 (Ohio Ct.App. Dec. 28, 2006) (same); State v. Callaghan, 222 S.W.3d 610, 616 (Tex.Ct.App.2007) (same). But see Plant v. State, 143 Idaho 758, 152 P.3d 629, 633 n. 2 (2006) (noting, in dicta, that despite Hudson, evidence acquired in violation of Idaho's knock-and-announce statute might require suppression under that state's law); Brumfield v. State, 155 P.3d 826, 833 (Okla.Crim.App.2007) (questioning, in dicta, whether Oklahoma's knock-and-announce statute might offer broader protection than the application of the rule under federal law).
I also note that nothing in the language of section 933.09 requires suppression of the evidence if the rule is violated. See Jenkins v. State, 924 So.2d 20, 32 (Fla. 2d DCA 2006) ("The knock-and-announce provisions . . . are silent with respect to the remedies that are available for their enforcement."); see also Southerland, 466 F.3d at 1084 (noting that the words contained in the District of Columbia's knock-and-announce statute and § 3109 were limited to the execution of search warrants and that both were silent with regard to remedies for violations). By contrast, some of Florida's statutes contain provisions specifically allowing for suppression of evidence obtained when law enforcement fails to comply with the statute. See §§ 901.151(6) ("Stop and Frisk Law"); 934.06 (illegally intercepted wire or oral communications), Fla. Stat. (2004). Section 933.09 contains no such provision. Presumably, if the legislature wanted to include the sanction of suppression as part of the statute, it could have chosen to do so. This absent sanction thus belies any presumption that the legislature intended to statutorily create higher protections in section 933.09 than those determined to exist under state or federal constitutional interpretation of the knock-and-announce rule.
Whether the evidence should be excluded in a particular case is an issue separate and apart from the question of whether law enforcement actually violated the knock-and-announce rule. In Hudson, the Supreme Court noted this distinction:

*1033 "In Whiteley [v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971)], the Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule." [Arizona v. Evans, 514 U.S. 1, 13, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).] We had said as much in [United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984),] a decade earlier, when we explained that "[w]hether the exclusionary sanction is appropriately imposed in a particular case, . . . is `an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" 468 U.S., at 906, 104 S.Ct. 3405 (quoting Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
126 S.Ct. at 2164. The Hudson Court further noted that:
[E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. In this case, of course, the constitutional violation of an illegal manner of entry was not a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house. But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is `fruit of the poisonous tree' simply because `it would not have come to light but for the illegal actions of the police.'" Segura v. United States, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).
Id. at 2164 (bold emphasis added). As in Hudson, even if it could be said that the entry in this case was illegal, any of Pruitt's interests which were potentially violated had nothing to do with the seizure of the evidencethere was no causal connection.
The Hudson Court further noted that to the extent there is any deterrence value to the exclusionary sanction, that value should be weighed against its social costs:

[T]he exclusionary rule has never been applied except "where its deterrence benefits outweigh its `substantial social costs,'" [Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)] (quoting Leon, 468 U.S., at 907, 104 S.Ct. 3405). The costs here are considerable. In addition to the grave adverse consequence that exclusion of relevant incriminating evidence always entails (viz., the risk of releasing dangerous criminals into society), imposing that massive remedy for a knock-and-announce violation would generate a constant flood of alleged failures to observe the rule, and claims that any asserted Richards [v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997)] justification for a no-knock entry, see 520 U.S., at 394, 117 S.Ct. 1416, had inadequate support. Cf. United States v. Singleton, 441 F.3d 290, 293-294 (C.A.4 2006). The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card.
Hudson, 126 S.Ct. at 2165-66 (emphasis added); see also Richardson v. State, 787 So.2d 906, 911 (Fla. 2d DCA 2001) (Altenbernd, J., concurring) ("Adequate remedies directed toward the persons who actually *1034 violate these constitutional rights would do far more to protect both the public and law enforcement from the dangers of unannounced entries into homes, than our current remedy. Our current method is not a deterrent to the police nor fair compensation to a victim; it merely allows an occasional lucky defendant to win Florida's knock-and-announce, five-seconds-too-early, exclusionary rule lottery.").
With regard to the exclusionary sanction's potential deterrence benefits, the Hudson Court was even more direct in its analysis:
To begin with, the value of deterrence depends upon the strength of the incentive to commit the forbidden act. Viewed from this perspective, deterrence of knock-and-announce violations is not worth a lot. Violation of the warrant requirement sometimes produces incriminating evidence that could not otherwise be obtained. But ignoring knock-and-announce can realistically be expected to achieve absolutely nothing except the prevention of destruction of evidence and the avoidance of life-threatening resistance by occupants of the premisesdangers which, if there is even "reasonable suspicion" for their existence, suspend the knock and announce requirement anyway. Massive deterrence is hardly required.
Hudson, 126 S.Ct. at 2166. Nevertheless, noted the Court, deterrents other than the exclusionary sanction are available for violations of the knock-and-announce rule, just as they are for other police misconduct; for example, the threat of a civil suit under 42 U.S.C. § 1983 (for which attorneys' fees are available under 42 U.S.C. § 1988(b)), the costs to municipalities of defending against such a suit, and advancements in police professionalism and training and the increased emphasis on internal police discipline. Id. at 2167-68; see also State v. Robinson, 565 So.2d 730, 733 (Fla. 2d DCA 1990) (suggesting that the use of the exclusionary rule as a sanction for knock-and-announce violations, which had been frequently employed by the trial courts since Benefield v. State, 160 So.2d 706 (Fla.1964), should be reconsidered).
Although the interests protected by the knock-and-announce rule include protection of human life and limb, protection of property from unnecessary damage or destruction, allowing the occupant the opportunity to comply, and protection of the occupants' privacy and dignity, "[w]hat the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant." Hudson, 126 S.Ct. at 2165 (emphasis added). This conclusion emphasizes the underlying purpose of the knock-and-announce ruleit does not pertain to the execution of a valid warrant; it only delays entry. Further, suppression should not be imposed reflexively as a remedy of first resort, but should be a remedy of last resort. Hudson, 126 S.Ct. at 2163. The sanction should be reserved for the most egregious violations which, as common sense dictates, are most likely to occur in warrantless search situations.
The St. Petersburg TACT's conduct here was far from egregious. As in Hudson, the law enforcement officers in this case executed a valid warrant based on probable cause (developed over the course of an extensive investigation) that drugs and records pertaining to Pruitt's drug distribution business would be located in Pruitt's residence. They knocked and announced their presence and waited twelve seconds before entrythe maximum amount of time their on-scene commander considered to be safe under the circumstances. Compare the circumstances in *1035 this case to those in Benefield. In that case:
[T]he officers totally ignored every requirement of the law as above interpreted. They barged into petitioner's home without knocking or giving any notice whatever of their presence; they did not have a search warrant or warrant to arrest anyone; they ransacked petitioner's home without the least semblance of any showing of authority. The petitioner was in bed sick at the time and the officers knew it.
Benefield, 160 So.2d at 709. The circumstances in this case are nothing like those in Benefield.[7] More importantly, there was no but-for cause of obtaining the evidence hereeven if TACT had entered a few seconds later, they would have executed the valid warrant and would have discovered the same evidence, subject to Pruitt's ability to dispose of it before then or meet the officers with violence.
Therefore, unlike the majority, I would have held in the alternative that even if the TACT team's entry in this case could be said to have violated section 933.09, Pruitt is not entitled to suppression of the evidence seized during the search pursuant to the Supreme Court's decision in Hudson. Finally, I would have certified this issue as a question of great public importance.
NOTES
[1] Damian Schmitt was described as a veteran who had executed fifty to seventy-five search warrants.
[2] This testimony supports the additional concern that Pruitt might attempt to dispose of the drugs, but this factor was not discussed in the State's appellate brief. Presumably this was because there was no noise emanating from within from which TACT could conclude that drugs were being destroyed.
[3] Information developed during the investigation was described in the affidavit.
[4] A situation made necessary as result of the fact that Florida does not recognize a "no-knock" search warrant.
[5] In Avendano, a confidential informant told police that Avendano told him that he would be armed on the morning of the execution of the warrant. 540 So.2d at 920. Although the information in Avendano was more direct than in the instant case, we believe the conclusion is equally valid under the circumstances of the present case.
[6] Ch. 9321, Laws of Fla. (1923).
[7] Because the circumstances in Benefield involved a warrantless entry accompanied by egregious police conduct, I do not think Hudson overrules its holding. In such circumstances, the exclusionary remedy would still be appropriate.